No. 3285

First Circuit

---

HUDSON v. LOUISIANA ELECTRIC COMPANY

---

(June 7, 1927.  Opinion and Decree.)
(June 28, 1927.  Rehearing Refused.)

---

(*Syllabus by the Editor*)

1. **Louisiana Digest—Telegraphs and Telephones—Par. 7.**

One who elevated a telegraph pole above a street in frequent use is negligent if he does this without first and before engaging in the work erect barriers and place warning signs to prevent people from coming under it.

2. **Louisiana Digest—Telegraphs and Telephones—Par. 7; Negligence—Par. 21.**

Where a street is left open during the erection of a telegraph pole, the unguarded approach is a tacit proclamation that the pole was safely held by the pikes. Therefore, the danger is not obvious until it is seen and understood, and one driving an automobile past this place does not assume the risk until he knows and realizes the danger.

3. **Louisiana Digest—Automobiles—Par. 7; Negligence—Par. 22.**

One who drives an automobile on an unguarded street past a place where a telegraph pole is being erected is not imprudent or negligent and is not contributorily negligent in the accident which follows the falling of the pole.

4. **Louisiana Digest—Negligence—Par. 41; Evidence—Par. 58, 59.**

The burden of proof is upon the defendant to show that the plaintiff's deceased husband was guilty of contributory negligence.

Appeal from the District Court, Parish of Jefferson Davis. Hon. Jerry Cline, Judge.

Action by Mrs. Mary Elizabeth Hudson, individually and as tutrix, against Louisiana Electric Company, Inc.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

Thomas Arthur Edwards of Lake Charles, attorney for plaintiff, appellee.

Pujo & Bell & Hardin of Lake Charles and Modisette & Adams of Jennings, attorneys for defendant, appellant.

ELLIOTT, J.  Suit by a widow, individually and as tutrix, to recover damages

on account of the death of her husband, killed while using a public street in the town of Jennings, by the fall of an electric light pole, while being erected by defendant; no precaution having been taken to prevent people from coming under the pole while it was being elevated.

James A. Hudson, while driving his automobile truck on the streets of Jennings, was struck on the head and killed by an electric light pole which the Louisiana Electric Company, Inc., had raised above the street for the purpose of setting, in the maintenance of its electric light system in said town. Mrs. Hudson, his widow, the mother and tutrix of their four children, all minors, brought suit individually and as tutrix against defendant to recover $30,000.00 damages on account of his death.

She alleges that the pole amounted to a deadly peril, erected by defendant on the street, and which as a result of defendant's gross negligence in the matter, fell on her husband and killed him.

Defendant, answering, admits that plaintiff's husband was killed by an electric light pole which it was erecting on one of the streets of the town. Alleged that it was being done in the usual way and that it had the right, by authority of the town, to erect the pole in the maintenance of its electric light system. That plaintiff's husband saw the men at work, saw the pole, one end of which had been hoisted up over the street on pikes, and should have stopped and not gone under it. That he accosted its employees, while they had the pole elevated, saying: "What are you boys trying to do?" And at the same time stopped his automobile in their midst, directly under the pole, so close to them that they were compelled to shift their position to prevent being struck by his automobile. That its men had the pole under complete control until deceased, by his carelessness, disturbed their attention. That its employees hollered at him when he was 60 or 75 feet away. That he disregarded their warning and dashed his automobile in their midst, occasioning them to lose control of the pole.

That there was not room for him to pass without striking one and probably two of its men. That he should have stopped at a safe distance and not run his automobile so close as to force the shifting of the men and pikes, thereby causing the pole to fall.

That the danger was apparent and obvious to the deceased. That deceased disregarded warnings, and the apparent and obvious danger, and recklessly exposed himself thereto. That other streets were open to him, but he chose a dangerous route, instead of a safe one, etc.

Defendant prayed that it be held free from fault, but in case it was found to have been negligent in the matter, that it be then held that the deceased was also negligent and at fault and that his fault and negligence in assuming an apparent and obvious danger, was contributory negligence of such character that plaintiff's right to recover was thereby barred.

Union Indemnity Company intervened in the suit, alleging that it had an interest in the result. It alleged that James A. Hudson was an employee of the town of Jennings and was killed while engaged in the service of the town and in the regular course of his employment.

That it had paid compensation to the plaintiff as his widow and as the tutrix of their children to the amount of $1,100.00. Funeral and medicine to the amount of $309.35; a total of $1400.35. That it had the right to recover from the defendant the amount it had expended as above stated

and prayed for judgment against defendant accordingly. The District Judge for written reasons, rendered judgment in favor of the plaintiff and against the defendant for $15,000.00 and in favor of the Intervenor and against the defendant for $1375.55 and authorized the defendant to pay the amount due the Intervenor as a credit against the amount awarded in favor of the plaintiff.

Defendant appealed.

The evidence shows that the defendant was engaged in elevating above one of the public streets of the town, a creosoted pole, 40 feet long, for the purpose of setting it. The pole was very slick and heavy. It was being erected in the maintenance of its electric light system in the town of Jennings. It had the right to erect poles for the purpose. Five streets intersected near the place where the men were at work; two of them were in frequent use. The ground adjoining the place was not built up with houses, but was occupied by some old boilers and other objects, as indicated by some pictures filed in evidence.

The nearest building was the Philip Miller warehouse, some 75 or 100 feet distant. Defendants' employees, six in number, with Dewey Phelps as foreman, laid the pole across the street, obstructing it from side to side. The top on the south and the butt on the north side and at the edge of a hole into which it was to be erected. The men lifted up the top and slipped a jenny under the pole. Four of them then got under it and raised it up on the points of their pikes. These pikes were from 14 to 18 feet long. A picture in the record, the general accuracy of which is not questioned, shows how the pole was being elevated, and its position at the time it fell. The picture shows that the butt end of one of the pikes was close to the south side of the street and that it leaned

forward at such an angle that it was approximately five or six feet from the end of the pole to the place where it rested on the point of the pike. The butt end of another pike was further out in the street but not in the middle, while the other two were both near the middle of the street, each leaning forward, their points being under the pole and holding it up in the air at an angle as shown by the picture; the jenny being nearest the hole. One of the men engaged in the work testified that the end of the pole was raised 20 or 25 feet, while two others thought that it was raised 15 or 20 feet high over the street.

After it was thus elevated the pikes were grounded, that is the men let the butt end rest on the ground, their points being under the pole and holding it up as shown in the picture. With the pole thus elevated, Johnson, one of the men engaged in the work, left his pike and went to the hole to see if the pole was slipping into it as they intended it should do.

No barrier had been erected on the street, no warning signs stuck up, nor guards stationed to prevent people using the street from coming under the pole.

It was at this juncture that plaintiff's husband drove up. There was not room for him to pass as he came to the place, without striking the men or some of them; so he stopped under the pole, on the extreme right hand side of the street, the right wheel of his automobile being on the edge of the gutter. He was stopped by the obstruction, and almost the moment he stopped the pole fell and killed him.

Speaking of the care which must be taken by a party engaged in erecting a work above a street, it is said in Cooley on Torts, 2nd Ed., Section 658, p. 790:

"The case may be instanced by a householder repairing his roof and while thus

engaged a slate falls and injures a person passing on the street. Here, manifestly, it was the duty of the householder to take such precautions as would prevent such an injury and the obligation of special care was on him. The passerby had a right to assume that no work being done over the sidewalk would subject him to danger. True, an act of God, or some excusable accident, may have caused the slate to fall, but the explanation should come from the party charged with the special duty of protection."

In Elliott on Roads and Streets, 3rd Ed., Vol. 2, Section 796, pp. 200 and 201, that author says:

"Where a municipality is engaged in doing work on streets, dangerous to persons using the street, barriers should be erected so as to warn people and prevent them from coming in contact with the danger."

In Section 799, pp. 204 and 205, it is said:

"Care must be exercised by municipalities to prevent injury to people using the streets, by poles hung or standing above the street, from falling on them in the street below."

In Section 803, pp. 212 and 213:

"When a highway or street is under repairs or becomes dangerous, it must be protected and barriers must be erected to prevent people using the street from coming in contact with the danger."

In Ruling Case Law, Vol. 13, Subject: Highways; that author speaking of precautions which should be taken while a street is being repaired, says:

"If it is left open to be travelled, the municipality must exercise ordinary care and take reasonable precautions to prevent injuries to travelers thereon. It may totally or partially close the street to public travel while the repairs are in progress; but if the way is not closed and no notice is given, travelers may expect that it is practicable to pass by safely and that they will have the protection which the law affords."

In Section 323 the author speaks of telegraph, telephone and electric light poles on roads and streets.

In Section 356, p. 435, speaking of dangers in roads and streets, the author says:

"They must be made safe by barriers erected and signs hung out to prevent people from coming in contact with the danger."

See also Section 358.

In Section 386, it is said:

"It is a well established rule that persons using a public street which is in constant use and when their attention has not been called to any obstructions or perils thereon, have a right to presume and to act on the presumption that the way is reasonably safe for ordinary travel, and this is equally true whether they are traveling at night or in the day. While the traveler can not recover if he runs blindly or recklessly into known danger, all that is required of him is ordinary care and that he walk with his eyes open, observing his general course and in the usual manner.

"He is not bound to anticipate danger, nor must he be constantly on the lookout for unknown or latent obstructions or defects when there is nothing to put him on his guard. He is not obliged to look constantly where he is going, nor to give unremitting attention to his steps; and it follows that he is not guilty of contributory negligence as a matter of law, merely because failing to do so, he falls into a hole or trips over an obstruction in the way."

We have quoted Sections which speak of the duties of municipalities, because they appear to be shorter; there are other sections in the same books, containing like provisions as to the duties and liabilities of individuals, corporations and public utility enterprises, using public streets, under authority of the municipal councils for the purpose of repairing and keeping their properties in condition to serve the purpose for which they were constructed.

In Thompson on Negligence, 2nd Ed., Vol. 1, Subject, Obstructions Endangering Travel on Roads and Streets; the subject is treated at still greater length. The subject matter commences with Section 1214,

p. 1088 and continues on to Section 1281, p. 1134. According to this author a party erecting a dangerous structure of any kind, over a public street, is under the obligation to effectively and timely warn people using the street of the danger and peril so as to prevent them coming under it unexpectedly, or within range of it. To that end, barriers must be erected and warning signs stuck up to prevent people from coming in contact with the danger. A person traversing a public street has a right to assume in the absence of barriers and warning signs, that it is safe and free from danger above and below his pathway; but he must not blindly and heedlessly expose himself to an obvious danger.

In Rock vs. American Construction Co., 120 La. 831, 45 South. 741, the Supreme Court says:

"As a municipal corporation would itself be liable to a citizen for injury sustained by reason of its reducing a sidewalk to a dangerous condition; it is evident that the privilege granted to a public utility company of making excavations therein, can not authorize such company to leave the excavations so unguarded and dispense with all precautions whereby those who are rightfully using the sidewalk may be warned of their existence. Nor can the company in such case escape liability on the plea that an excavation made under the authority conferred on it and for its account and benefit, has been made by an independent contractor."

In McCormack vs. Robin, 126 La. 594, 52 South. 779, it is said:

"Streets and sidewalks are intended for free and constant use and those who use them have the right to assume that they are safe, and they are not expected to exercise the care that would be required in traversing a jungle."

It seems from the law and the evidence in this case that it is a necessary conclusion that the defendant was guilty of negligence and carelessness in elevating this pole above a street in frequent use, without first and before engaging in the work, erecting barriers and sticking up warning signs, so as to prevent people from coming under it, in case it should fall.

The serious question is whether Mr. Hudson was guilty of negligence and fault in driving under it and stopping as he did and whether his act was one of the proximate causes which led to the fall of the pole.

D. L. Johnson, engaged in raising the pole, testified that just about the time the pole fell, a second before the crash, he heard someone holler "look out". And in a moment or two, right about the same time, he heard the crash of the pole, turned around and saw that it had fallen on Mr. Hudson. That the pikes under it must have released it, as it fell straight down to the ground. That Mr. Hudson could have caused the men with the pikes to move and caused it to fall.

James Edwards, also engaged in the work, testified that when Mr. Hudson drove up he says: "Hey, boys or what do you think you are doing" and the pole immediately fell. That Mr. Hudson didn't say anything before he drove up and stopped, but that after he stopped he said as he stopped, when he was coming to a stop, "Hey, boys" or "What do you think you are doing," and the pole immediately fell. Asked if it was after he stopped or before, and his answer was that it was as he stopped. He further testified that Mr. Hudson, by putting one wheel down into the ditch, could have gotten by, without stopping, if he hadn't got stuck in the ditch. That the front wheel of his car had passed Phelps before he stopped. He estimated the time which elapsed between Mr. Hudson's statement—what are you fellows trying to do—and the crash as not over two seconds, two split seconds, two snaps of the finger.

Darrel McClung, another employee, said that he heard at least two voices warning Mr. Hudson as he started to make the corner, to "look out; don't come under here". That Mr. Hudson was approximately 35 or 40 feet from the pole at the time. That immediately after he said, "What are you fellows doing" the pole fell.

Dewey Phelps, foreman in charge of the work, didn't know what caused the pole to fall, but thought that a pike must have slipped and caused it. That he was the last man next to the ditch. That the pikes were all grounded. That they had nothing to do at the moment; were waiting for Johnson to see if the pole had started into the hole properly and were then going on with the work. That he first saw Mr. Hudson, 40 or 50 feet away, as he turned toward the pole and that Mr. Hudson said, just as he stopped: "What do you boys think you are trying to do here?" That there was not room for Mr. Hudson to pass between witness and the ditch. That he called to Mr. Hudson as he turned the corner, about 30 feet away. He didn't recall just what he said, but he usually warned anybody going that way to stop. Didn't try to stop Mr. Hudson when he first saw him, because he had several ways to turn, and that after he had turned, he didn't have time to stop him. That very soon after Hudson stopped the crash came. He didn't remember whether he said stop, or don't drive under here. That he knew he started to call, and after he saw Hudson coming, he thought he was coming through and get out of the way. That Hudson could have passed if he had gone on and not stopped. That Hudson made the remark, "What do you boys think you are trying to do here," before the pole fell.

H. L. Boudreaux was standing on the platform of the Philip Miller warehouse, some 60 or 70 feet away, looking at de-fendant's employees erect the pole. He saw Mr. Hudson as he drove up and stopped, and says that he drove up and stopped under the pole and almost instantly afterwards the pole fell. That the moment Hudson stopped, somebody hollered "look out," upon which witness looked at the pole and also at Hudson and the pole began to fall. That Hudson also looked up and saw the pole falling and attempted to leave his seat and just as he bent over the pole struck him.

Luma Duhon was standing in a doorway of the Philip Miller warehouse, about 100 feet distant, looking at the men elevate the pole and saw Mr. Hudson as he drove up. He says that as Mr. Hudson turned toward the pole, someone hollered two or three times "stop, look out". That Hudson had stopped at the time he was hollered at. That the pole fell, just as the call was made.

Defendant contends that Mr. Hudson saw the men in the street and the pole elevated overhead on pikes in time and had time to stop at a safe distance and should not have driven under it. That it was an apparent and obvious danger and that he assumed the risk.

The facts and circumstances indicate that the danger and peril was not apparent and obvious to Mr. Hudson and that he did not become aware of same until it was too late for him to avert being killed by the pole. Until he had turned into the street facing the men, his view of what was going on there, was partially obstructed by some old boilers and other things, as indicated by some pictures filed in evidence. The evidence indicates that after he had turned the corner and started toward the men, some 30 or 40 feet distant, the distance and time of travel was so short, that he had no opportunity to take in the situation

until he had reached the place. He then saw that he could not pass the unexpected obstruction and stopped.

The obstruction stopped him. This fact appears from the evidence of Mr. Phelps, who, being asked why Mr. Hudson was not stopped, answered that after Mr. Hudson had turned the corner and started toward them, he didn't have time to stop him. Mr. Hudson was, therefore, permitted to come up to the place, and no effort was made to keep him back; he finally saw that he could not pass and stopped where he did as a result of the barred passage.

The preponderance of the evidence is also to the effect that the warning call to "look out" was not given until he was slowing down, coming to a stop, and was not given until he had come under the pole and stopped within reach of the peril.

A danger is not obvious until it is seen and understood. A risk is not assumed until it is known and realized. In this case we do not think that the danger from this pole was observed by Mr. Hudson before he stopped; because he had not had time before encountering it to comprehend the situation. The open unguarded approach was a tacit proclamation that the pole was safely held up by the pikes.

It is our conclusion that Mr. Hudson did not realize his peril until the pole started to fall, that it was in the act of falling when he stopped and that it fell before he had an opportunity to get out of the way.

In Knight vs. Pontchartrain R. R. Co., 23 A. 462, the Supreme Court formulated what seems to be the prevailing rule on the subject of contributory negligence, as follows:

1. When the conduct of the plaintiff has, as a matter of fact, contributed to the accident, but such conduct has not been in a legal sense imprudent or negligent. In such cases the plaintiff may recover from a defendant at fault.

2. Where the conduct of the plaintiff has been imprudent or negligent; but such imprudence or negligence has not contributed to the accident. In such cases the plaintiff may recover from a defendant at fault.

3. Where the conduct of the plaintiff has been negligent and has contributed to the disaster. In such cases the plaintiff can not recover, even though the defendant be at fault.

The above rule was approved in Hanson, Tutor, vs. Railway Transportation Co., 38 La. Ann. 111. In that case a party about to take a seat in the cab of a locomotive, noticed and spoke of what he took to be an imminent and threatening danger and got up and started to leave, but being assured by the engineer that there was no danger, he consented to remain and was the next instant seriously injured by an explosion, the danger of which he had noticed. The question of obvious danger, assumed risk and contributory negligence was carefully examined and the court came to the conclusion that plaintiff could recover under the facts of the case.

In Summers vs. Crescent City R. R., 34 La. Ann. 139, the question of obvious danger and contributory negligence and assumed risk was involved and the court announced the governing principles, and we think the court's conclusion pertinent to the present case.

In Clerc vs. Morgan's Louisiana & Texas R. R., 107 La. 370, pp. 377 to 382; 31 South. 886; the same questions of obvious danger, assumed risk and contributory negligence again underwent a close examination and the conclusion reached in Summers vs. Crescent City R. R., 34 La. Ann. 139, was approved. We think the reasoning of the court in 107 La. 370 pertinent to the present situation.

In the case, Mary Cline vs. Crescent City R. R., 43 La. 327, 9 South. 122, the court says, p. 334:

"To constitute contributory negligence, there must be a want of ordinary care and a proximate connection between that and the injury."

In Ferris vs. Hernsheim, 51 La. Ann. 178, 24 South. 771, the court, speaking of contributory negligence, says, p. 180:

"It has been aptly stated to be, a want of ordinary care upon the part of the person injured, by the actional negligence of another, combining and concurring with that negligence, and contributing to the injury as a proximate cause thereof, without which, the injury would not have occurred."

In Ruling Case Law, Vol. 20, Section 113, p. 136, it is said on the subject of proximate cause:

"To defeat a recovery under the common law rule, the plaintiff's negligence must have co-operated with the negligence of the defendant and contributed to produce the injury complained of. As it is expressed, the plaintiff's negligence must have been entered into and formed part of the efficient cause of the injury. If it operated only remotely and not proximately to cause the damage, the plaintiff is not barred of redress."

The burden of proof is upon defendant to show that plaintiff's husband was guilty of contributory negligence. Casey vs. Abraham & Son, 113 La. 589, 37 South. 484; Weis vs. N. O. Ry. & Light Co., 133 La. 14, 62 South. 216.

Defendant alleges and urges that Mr. Hudson drove under the pole and stopped so close to it, that he thereby compelled its employees to shift their position to avoid being struck and that he was responsible for the fall of the pole. Two witnesses made remarks while testifying, that Mr. Hudson *might* have caused the pole to fall by driving his automobile so close to the men; but they do not make a positive statement to that effect. They do not directly say that he caused the pole to fall, but rather advance that idea as something that he could have done. Asked directly how the pole came to fall, both Johnson and Phelps say that they don't know what caused it, but they thought it was due to the fact that it was loosely and not securely held by the points of the pikes. They both testified that the pole fell straight down to the ground. That is what would take place, if the pikes under it had not been stuck into it deep enough to securely fasten and hold it, and that is no doubt why it fell.

The evidence does not warrant the conclusion that Mr. Hudson's driving up and stopping where he did, caused the men to lose control of the pole, or contributed to its fall.

Defendant urges that Mr. Hudson should have used some other street. He was not required to take another street, unless he had timely seen and comprehended the danger from the pole. The pole and the men holding it up was an unexpected and veritable deadfall, in the act of dropping at the time he discovered his peril.

We are satisfied from the evidence that the death of plaintiff's husband was due to defendant's negligent elevation and handling of a pole of such length, size and weight over a frequently used street, taking no precautions to keep people from coming under it. That the danger was not obvious to Mr. Hudson before he drove up and stopped under it; that he was in fact unaware of the peril. We do not think that under the facts and circumstances, his act in driving up and stopping as he did, can be classed as contributory negligence, helping in a proximate way to bring about the fall of the pole and his own death.

The judgment appealed from is in our opinion correct.

Judgment affirmed. Defendant and appellant to pay the cost in both courts.