## MARTIN CLARK v. STATE.
No. A-4270.   Opinion Filed April 10, 1924.
(224 Pac. 738.)

(Syllabus.)

1. Homicide—"Manslaughter in Second Degree"—Statute. "Any killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree." Section 1745, Comp. Stats. 1921.

2. Same—"Culpable Negligence" Defined. "Culpable negligence" is the omission to do something which a reasonable, prudent, and honest man would do, or the doing of something which such a man would not do, under the circumstances surrounding the particular case (quoting Words and Phrases, First Series "Culpable Negligence").

3.    **Same—Evidence Sustaining Conviction for Manslaughter in Second Degree by Mine Foreman.** The proven omission of duties imposed by statute upon a mine foreman, together with other manifest omissions of duty not defined by statute, as shown in this case, are sufficient to sustain a charge of criminal negligence.

(a) Statutory provisions imposing duties to take certain precautions concerning work carried on at a place and under conditions manifestly dangerous do not necessarily preclude the duty of observing other precautions not covered by statute.

Appeal from District Court, Latimer County; E. F. Lester, Judge.

Martin Clark was convicted of manslaughter in the second degree, and he appeals. Affirmed.

Philos S. Jones and Monk & McSherry, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. Martin Clark, plaintiff in error, here designated the defendant, was by a verdict of a jury rendered October 6, 1921, found guilty of mansaughter in the second degree, and his punishment was assessed at imprisonment in the county jail for a period of one year and a fine of $500. From the judgment on this verdict he appeals.

This prosecution and conviction were based on culpable negligence. The defendant was the foreman or pit boss at Mine No. 19 of the Missouri, Kansas & Texas Coal Company in Latimer county. This was a large mine, the excavations and underground workings of which extended over an area of more than 300 acres. These excavations consisted of tunnels, slopes, entries, rooms, and air courses, with some electric tramways and a telephone system. On the 21st day of August, 1920, there were approximately 140 men employed and working at various places in this mine. On this date and

prior thereto there was, in what was known as the fourth east entry, a strong vein or feeder of noxious, combustible, and explosive gas, which discharged large amounts of gas that undiluted with air would produce asphyxiation, and when mixed with a certain small percentage of air became combustible and highly explosive, but when diluted with a greater percentage of air became harmless. There was and had been in operation an air fan of sufficient size and dimensions, with sufficient revolutions per minute, to force a great enough current of fresh air through the tunnels, slopes, entries, rooms, and air courses within the mine, that those persons working there might have fresh air to breath, and that these noxious and combustible gases might be rendered harmless, and to drive and carry the gas out at an exit provided. On this day this fan, for some reason or other, ceased to run for a period of time variously estimated at from 20 to 30 minutes. During this interim the gas accumulated in sufficient quantities near the fourth east entry that when some employe of the company started the fan in operation this body of gas was driven along the passageway and into the rooms of the fourth east entry, where miners were at work with burning lamps, getting out the coal, resulting in an explosion in which ten men were instantly killed.

The charging part of the information is very lengthy. The charges, condensed, may be stated as follows:

First. That the defendant was the mine foreman, in full charge and control of the operations, management, and direction of the mine and of all machinery and apparatus belonging thereto, so far as they pertained to the underground workings, tunnels, slopes, entries, and air courses.

Second. That he was overseer and directed the mining operations in getting out the coal, making drifts and tun-

nels, and delivering the coal to the cars and containers by means of which it was taken to the shaft and hoisted to the earth's surface.

Third. That it was the defendant's duty to see that fresh air was kept moving through a shaft into these underground tunnels, slopes, entries, air courses, and rooms, and to see that air was properly conducted into the places where the men were at work, by means of air courses, curtains, cut offs, and brattices, made from canvas, lumber and other materials.

Fourth. That there were large veins of noxious and explosive gases exuding into and near the fourth east entry where a number of men were mining coal, so that working in that portion of the mine was more hazardous and dangerous than in other places, and that the defendant, being a miner of long experience, well knew of this extra hazard and danger, and knew that it required the greatest degree of precaution and care to protect the lives and safety of the persons there employed.

Fifth. That it was the duty of the defendant to operate, or co-operate with others in operating, an air fan of sufficient size and dimensions, with sufficient revolutions per minute, to force a current of fresh air through the air passages and other parts of the mine, so as to furnish fresh air for breathing purposes and for the further purpose of diluting the explosive gas there collecting so as to render it harmless.

Sixth. That it was the duty of the defendant, in the event that the fan should fail or cease to operate through unavoidable accident, or otherwise, to immediately and before again starting the fan in motion cause any and all persons within the mine to be removed therefrom as quickly as possible.

Seventh. That it was the duty of the defendant to install and keep in operation a telephone system, as required by law, to enable the operators on the surface or elsewhere to notify the diggers and miners of impending danger, including the stopping of the fan, or from any other cause.

Eighth. That the defendant, culpably unmindful of his duty of protecting the safety and the lives of the men there working, permitted the telephone system to be and remain out of order, so that at the time of the explosion it could not be used to notify the men that the fan had ceased to operate, and that they should repair to a place of safety.

Ninth. That the defendant, in conjunction with other employes, was culpably negligent in not providing for an overseer or some person to watch the fan to see that the fan and the air current were constantly in motion.

Tenth. That the defendant was culpably negligent in not making the proper arrangements to see that after the fan had ceased to operate and these noxious and explosive gases allowed to accumulate in the fourth east entry the fan should not again be put in motion until all the men had evacuated the mine; that permitting the fan to be put in motion after it had stopped for an interval of 20 or 30 minutes caused the accumulation of noxious and explosive gases to be driven to where the men were at work with burning lamps, resulting in the explosion in which 10 men lost their lives.

It appears that the fan used to force air into and through the mine had been propelled by a steam engine, and that for some reason or other it became necessary to repair the steam engine, and that the fan, on the day preceding the explosion, had been connected with an electric motor; that, knowing of this change, a committee of miners on the morn-

ing of the accident called upon the defendant, and stated to him that the men were afraid to work in the mine for fear the electric current might be interrupted, causing the fan to cease to operate for a time at least, and requested the defendant to put a man in charge of the fan to see that it was kept in operation, or, in the event that it should cease to operate, the men working in the mine might be promptly notified. A master mechanic, one Ben Treado, who was repairing the steam engine, said that he would be there, and that he would watch the fan. The defendant himself made no reply, made no promises, and offered no suggestions. This master mechanic, Treado, was working on the engine 300 yards distant from the air shaft and fan. The evidence does not disclose where he was when the fan ceased to operate, or what caused it to stop.

At the time of the explosion the defendant was engaged in making a round of inspection through the various workings of the mine, and did not know about the interruption in the operation of the fan and the subsequent happenings until after the explosion, when he was informed of the catastrophe by one or more of the men as they were making their escape from the region of the explosion.

The evidence further shows that the party line telephone was in bad order; in fact, was not working; that in places the current had been grounded, and that an attempt to notify those on the surface that the air current had ceased moving was futile; that certain signals were given by means of bells, and that messengers were sent to different parts of the mine as rapidly as possible to inform those there of impending danger; that the defendant, so soon as he was apprised of the explosion, did everything within his power to prevent further fatalities and gave directions that the men should leave the mine; that he organized the rescue party,

who made explorations into the region where the explosion had occurred, using safety lamps.

Manslaughter in the second degree is defined by our statutes (section 1745, Comp. Stats. 1921) as follows:

"Any killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

It was the theory of the state that the information charged and the proof showed that the death of these 10 men was directly due to the culpable negligence of the defendant.

"Culpable negligence" has been defined as the omission to do something which a reasonable, prudent, and honest man would do, or the doing of something which such a man would not do, under the circumstances surrounding the particular case. An act, or an omission, to be culpable, that is, to be a breach of legal duty, must be such as would cause a reasonable, careful man to foresee that the result would be productive of injury. 2 Words and Phrases, First Series, 1780, and cases cited; 1 Bouvier's Law. Dict. (Rawle's 3d Ed.) 736. Our own court has defined culpable negligence thus:

"The want of that usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions." Kent v. State, 8 Okla. Cr. 188, 126 Pac. 1040.

Culpable negligence may be predicated upon acts of omission as well as upon those of commission. 13 R. C. L "Homicide," § 157 et seq.

"It is an undeniable philosophic truth, * * * that a person's liability for his acts depends upon their tendency un-

der the circumstances known to him." 20 R. C. L. 11; Commonwealth v. Pierce, 138 Mass. 165, 52 Am. Rep. 264.

The defendant says that his authority and duties pertained only to the supervision of affairs underground, and that by contract and custom and pursuant to his duties prescribed by statute he had nothing to do with the operation of the fan at the mouth of the shaft. He asserts likewise that maintenance of the telephone system was a duty lodged with the superintendent, and that no defects in the operation of the fan above ground or in the maintenance of the telephone system above or under ground could be imputed to him; that if culpable negligence was proved it must be imputed to the persons whose duty it was to see that the fan was kept in operation, and who were under obligation to see that the fan was kept in motion, and to see that the telephone system was in working order.

This theory of the defendant seems to be based, in part, at least, upon the assumption that he owed no duties to the workmen underground except those specifically prescribed by statute or by specific contract. The several statutory provisions relating to safety in mines, construed together, indicate that all the employes of whatever rank were to co-operate with one another to see that mines are safe to work in. To us it seems clear, under these statutory provisions, that the defendant's duty under the circumstances in this case did not end at the mouth of the shaft.

The fan was the very heart of the ventilating system, and the underground passages were the veins and arteries through which fresh air designed to dilute and render harmless the poisonous and explosive gases circulated. The defendant occupied the important position of mine foreman, whose attention had been specifically called to the unsafe condition of the fan by a committee of workmen recognized

by law. This complaint had been made to the foreman personally, in the absence of the superintendent; it was well known to this foreman that any interruption in the operation of the fan might cause the lives of the workmen below ground to be instantly snuffed out. Under such circumstances one in authority cannot escape responsibility for failing or refusing to make the fan safe and sure of continued operation merely because it was located on top of the ground, at the head of the ventilating shaft, ordinarily under the supervision of some other person.

The statute provides that it shall be unlawful for any person, company, corporation, owner, lessee, officer, or agent to operate or permit to be operated any coal mine within this state not equipped with a party line telephone system, proceeding at length and in detail to describe the character of telephone system required. The evidence here discloses that the telephone system in this mine was and for several days had been out of order and the fact that the phone system was so out of order contributed to the delay in notifying the operators at the mouth of the mine of the cessation of the fan, and this unnecessary delay directly contributed to the fatal explosion. The mine foreman whose duty it was to supervise the mining operations underground should have exercised reasonable care and ordinary caution to see that the telephone system was in working condition. The evidence disclosed that some of the wires had been grounded for several days, and the efforts to communicate over the telephone so soon as it was discovered that the fan had stopped were futile, requiring the use of bell signals to notify the operators above the surface, an inadequate method of conveying information of the impending danger. The fact that the telephone system was not working properly also prevented those who discovered that the fan had stopped

from notifying others who were at work in the various underground excavations.

From a humane standpoint, as well as under the statutes, it was the duty of the foreman to take at least reasonable precaution to insure the safety of the men about to go to work at a place of known danger. The claim of the defendant that the statutes alone fixed the measure and limitations of his duty toward his fellow employes is not founded in reason nor supported by authorities. One may be required to act with reasonable prudence where there is no statute specifically prescribing his duties. There are instances where persons are guilty of culpable negligence independent of statutes specifically pointing out how or in what manner dangerous activities should be carried on. Barrow v. State, 17 Okla. Cr. 340, 188 Pac. 351, 9 A. L. R. 207, annotations, 211; Pamplin v. State, 21 Okla. Cr. 136, 205 Pac. 521, annot., 23 A. L. R. 1554; Johnson v. State, 66 Ohio St. 59, 63 N. E. 607, 61 L. R. A. 277, notes 299, 90 Am. St. Rep. 564; annotations, L. R. A. 1917C, 536; annotations, L. R. A. 1918B, 954; 13 R. C. L. "Homicide," § 161; 29 Corpus Juris, 1158. Nor is it any defense for one charged with manslaughter resulting from culpable negligence to show that others besides himself were negligent directly contributing to the loss of life. State v. Shelledy, 8 Iowa, 477; Commonwealth v. Cook, 8 Pa. Co. Ct. Rep. 486; Ainsworth v. U. S., 1 App. D. C. 518; notes, 61 L. R. A. 298; 13 R. C. L. "Homicide," § 161; 29 Corpus Juris, 1155.

So that if this defendant and Ben Treado were both under legal obligation to see that the fan was kept running, and by their gross negligence failed to do so, directly causing the death of these miners, both would be guilty, and the negligence of one would not excuse the other. Whether there was such negligence on the part of one or both, directly

causing the fatal explosion, under the circumstances here, was a question for the jury. The record shows that there was evidence, if believed by the jury, indicating that the defendant was culpably negligent in not providing for a watchman for the fan, or in permitting the men to go to work under ground without such precaution. Of course the negligence of one cannot be imputed to the other so as to hold him criminally liable for the independent acts or omissions of the other.

The same reasoning applied to defendant's authority and duties relating to the telephone system. If the defendant was primarily negligent in allowing the telephone system to be and remain out of repair, and the fact that the telephone system was in bad order directly prevented miners who knew of the danger notifying other employes to repair to a place of safety after the fan had ceased to operate, the fact that another besides defendant was also under obligation to see that the telephones were kept in order would not excuse nor palliate the culpable negligence of the defendant, if such negligence there was.

Bearing in mind that the defendant had charge of the underground workings of the mine, that he had been cautioned by a mine inspector to repair the telephone system, that the person who usually repaired the telephone was, partially, at least, under the direction and authority of the defendant, and that for a day or two this man had been engaged in other repair work about the mine, the jury would be justified in concluding that the defendant was directly responsible for allowing the telephones to be and remain out of order.

Those in charge of the operation of coal mines, in whole or in part, should have a decent regard for the lives and safety of those working under them, and more particularly so where mining is carried on under conditions extraordi-

narily hazardous because of veins and feeders of noxious and explosive gases. Under such circumstances every reasonable precaution should be taken by every person engaged in the work where it is manifest that the want of care on the part of any of the persons responsible may bring on fatal consequences. The absence of such care may be culpable negligence within the meaning of the statute defining second degree manslaughter.

Having reached the conclusion we have, it will serve no good purpose to treat the several assignments of error separately, further than to state generally that the defendant was accorded a sufficient preliminary hearing; that there was no error in refusing the several instructions requested, and not given; that the instructions given by the court were as favorable to the defendant as the law and the facts in the case warranted; and that the evidence adduced at the trial was competent, and, construed as a whole, supported the verdict. The judgment of the court below is therefore affirmed.

MATSON, P. J., and DOYLE, J., concur.