# THOMAS CHARLIE CHANDLER v. STATE.

No. A-10181.    March 1, 1944.

(146 P. 2d 598.)

324

Laynie W. Harrod, of Oklahoma City, for plaintiff in error.

Randell S. Cobb, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Lewis R. Morris, Co. Atty., of Oklahoma City, for defendant in error.

BAREFOOT, J.   Defendant, Thomas Charlie Chandler, was charged in the district court of Oklahoma county,

with the crime of manslaughter in the first degree, was tried and convicted of manslaughter in the second degree as an included offense, and his punishment assessed at confinement in the State Penitentiary for a term of two years; and he has appealed.

For a proper consideration of this case, it is necessary to first detail a concise statement of the facts.

The charging part of the information was as follows:

"On the 9th day of February, A. D. 1941, in Oklahoma County, State of Oklahoma, Thomas Charlie Chandler * * * did then and there wilfully, unlawfully and feloniously commit the crime of manslaughter in the first degree, that is to say, that said defendant, in the county and state aforesaid, and on the day and year aforesaid, then and there being, did then and there wilfully, unlawfully, negligently, wrongfully, and feloniously, drive a certain automobile, to-wit: a 1941 Ford Tudor sedan automobile, bearing Oklahoma 1940 license number 1-63404, upon a public highway, to-wit: On north and south county highway, one mile east of Arcadia, in said county and state, and did then and there drive said above described automobile north upon said highway in a culpable and negligent manner, and at a high and dangerous rate of speed, and at a speed that was greater than was reasonable and proper under the circumstances, and conditions, then and there existing on to said highway, and without due regard to the traffic, surface and width of the said highway, and said defendant did then and there drive as above described at a speed that was greater than would permit him to bring said motor vehicle to a stop within the assured clear distance ahead, and while driving as above described, the said defendant did drive said 1941 Ford Tudor Sedan automobile into and against a certain 1935 Buick sedan automobile Oklahoma 1940 license 1-16724, which vehicle was then and there being driven south on said highway by George Washington Wilson, and in which said automobile one Mollie Cecil Wilson was then and there a pas-

senger, with such force and in such manner as to inflict on the head and body of the said Mollie Cecil Wilson certain mortal wounds from which wounds so inflicted the said Mollie Cecil Wilson did die on the 9th day of February, 1941;" etc.

Under this charge defendant was prosecuted for manslaughter, and convicted of manslaughter in the second degree, as above stated. The statute, 47 O. S. A. 1941, § 92, upon which the contention of the state is based, is as follows:

"Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and no person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop within the assured clear distance ahead. * * *

"Any person violating the provisions of this section shall be guilty of a misdemeanor and shall, upon conviction, be fined not less than ten dollars ($10.00) and not more than one Hundred dollars ($100.00), or imprisoned in the county jail for not less than ten (10) days nor more than thirty (30) days, or by both such fine and imprisonment. Provided, that it shall be unlawful for an arresting officer to participate in or receive any portion of the fines or fees collected from any persons under this section."

The facts, about which there is very little conflict, were: The defendant, Thomas Charlie Chandler, lived a few miles north of Arcadia, in Oklahoma county. He came to Oklahoma City on the afternoon of February 9, 1941, in a 1941 Ford automobile, remained a short while, and with his brother, Quinlan O. Chandler, a cousin, Annie Belle Lee, and her husband, Henry Lee, and Otis Long, started to return to his home. He was driving his car, and

they drove to Arcadia, on U. S. paved Highway No. 66, and turned north on a dirt road, and had gone about a mile and a quarter when the collision occurred, which resulted in the death of Henry Lee and Otis Long, and of Mollie Cecil Wilson, who was riding in the front seat of the Buick car driven by her husband, George Washington Wilson. Annie Ogles was riding in the back seat of the Wilson car.

This tragedy was the result of a head-on collision between the Ford and the Buick cars, just on the north side of a hill which is designated as hill No. 2 in the pictures introduced in evidence and attached to the case-made, and about 75 or 100 feet from the top of the hill. All of the parties involved were colored. The people in the Wilson car had been to church and were returning to Oklahoma City. The Ford car, driven by the defendant, was going north, and the Buick, driven by Wilson, was going south. The uncontradicted evidence of both the state and the defendant is that the collision occurred on the east side of the center of the highway; that both cars were on the east side of the center at the time of and after the collision, and that the Ford was never across the center of the highway. The state admitted that the Buick car was on the wrong side of the road, as provided by Tit. 69 O. S. A. 1941, § 583, which is as follows:

"Vehicles in meeting each other shall keep to the right of the center of the road. . . . "

The evidence disclosed that the road at the point of the collision was 38 feet wide; that the main travelled part of the road was on the east side of the center; that the west side was somewhat rough but was passable and cars drove on that side and had driven on that side on the day of the accident; and that it would have been impossible

for defendant's car to have passed to the right, or east of the Buick, there being an inclining bank about six feet high, at an angle of about 45 degrees. The record further reveals that the road was graded by the highway maintenance crew the morning following the accident, and prior to the time the pictures introduced were taken, but witnesses testified to the condition of the road prior to the time it was graded. The collision occurred between 6:10 and 6:20 in the afternoon.

Briefs have been filed by the defendant and the state. The brief of defendant cites a few cases, which do not bear on the main question involved, and the brief of the state does not cite a single decision.

We find here a question of first import in this court, and one that has not been before the Supreme Court of this state—a question that is very important to the citizens of the state. We have examined a number of text books upon the law of automobiles, and have ready many cases from other states. There are abundant authorities which pass upon questions very similar to the one here involved.

The first contention of the defendant is with reference to the construction to be placed upon the statute above quoted. His contention is that this statute only has reference to objects which are stationary, or where motor-driven vehicles are going in the same direction, and that it has no application where they are moving in opposite directions, as in the instant case.

We have been unable to find any case from this court, or from the Supreme Court of this state, involving the same or similar facts. Nor have we been able to find any decision from any court construing a statute of similar import. There is no question in my mind but that at the time of the enactment of this statute, the Legisla-

ture had principally in mind stationary objects, and the collision of cars going in the same direction; but we cannot but come to the conclusion that it also applies to motor vehicles driven in opposite directions. Certainly if one saw a car coming toward him it would be his duty to exercise such reasonable diligence in the handling of his car as to avoid collision with an oncoming car. By this statement we do not refer to the facts as they exist in the instant case, and which we shall hereinafter discuss more fully.

This statute does not provide for a definite speed limit, as do many statutes. But it has limitations which are stronger than if it had a definite speed limit. Under its terms, what might be a safe speed limit, under a certain set of circumstances, would not be safe under another or different set of circumstances. This might be illustrated by the fact that where one is driving on the crowded streets of a city where there are intersecting streets every few hundred feet, it is certainly more dangerous than driving upon a public highway where but few cars are passed, and few people are walking. The same may be said to be true when passing a public park, or a public school where children are constantly playing and frequently passing the intersections, also where one is passing a number of cars on the public highway, even though they are coming in opposite directions. Also, under the terms of this statute, a rate of speed in the daytime, or on a bright clear day, might not be considered unreasonable, but the same rate of speed in the night-time, or on a wet, slick road, or on a dark and cloudy day, might be considered unreasonable. And as expressed in the very terms of the statute itself, one should have "due regard to the traffic, surface and width of the highway and of any other conditions then existing."

Certainly if one saw a number of cars coming from the opposite direction he would not have the right to drive at a rate of speed under the terms of this statute as if the string of cars were not coming toward him. Certainly his rate of speed should be governed by the conditions of the "traffic, surface and width of the highway and of any other conditions then existing," whether those vehicles are being driven in the same or opposite direction from that in which he is traveling.

In other words, under this statute, a party driving a motor vehicle in this state is charged with the responsibility of taking into consideration those conditions named in the statute, and of at all times having the motor vehicle under such control as the facts and circumstances warrant. To our mind this statute is much more exacting than if it set a definite speed limit. We have, therefore, come to the conclusion that the above statute should not be so construed that it could not under certain circumstances be applied to cars moving in opposite directions.

The principal contention of the state is that notwithstanding the fact that the car in which Mollie Cecil Wilson was riding was on the wrong side of the road, the evidence also showed that defendant was driving at an excessive rate of speed, in contravention of the statute above quoted, and that he was, therefore, guilty of a violation of this statute, and his conviction should be upheld.

This statute makes the violation thereof a misdemeanor. The statute on manslaughter in the first degree, 21 O. S. 1941 § 711, provides that one who kills a human being while committing a misdemeanor shall be guilty of manslaughter in the first degree. The jury convicted the defendant of manslaughter in the second degree, in accordance with the instructions of the court, as an included

offense. This statute is 21 O. S. A. 1941 § 716, and is as follows:

"Every killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

Defendant requested six instructions, five of which were refused by the court, but the instructions given contained the principles of law announced in the special instructions. We shall hereafter refer to the instructions in discussing the questions involved.

This court has often had before it the construction of the statute involving manslaughter in the second degree. We have often defined what is meant by the term "culpable negligence," or "criminal negligence." Nail v. State, 33 Okla. Cr. 100, 242 P. 270; Clark v. State, 27 Okla. Cr. 11, 224 P. 738; Kent v. State, 8 Okla. Cr. 188, 126 P. 1040; Wilson v. State, 70 Okla. Cr. 262, 105 P. 2d 789; Freeman v. State, 69 Okla. Cr. 164, 165, 101 P. 2d 653; Philby v. State, 64 Okla. Cr. 1, 76 P. 2d 412; Ansley v. State, 44 Okla. Cr. 382, 281 P. 160; Mayse v. State, 38 Okla. Cr. 144, 259 P. 277; Herndon v. State, 38 Okla. Cr. 338, 261 P. 378; Smith v. State, 46 Okla. Cr. 160, 287 P. 1103. In many of these cases the evidence revealed that the defendant was under the influence of intoxicating liquor.

And we have drawn a distinction between the terms of the statute as it applies to criminal liability, and to civil liability. Nail v. State, supra. See, also, Huddy Encyc. of Automobile Law, vol. 9-10, p. 78.

It is generally recognized that in order to commit one a criminal, there should be a higher degree of negli-

gence than is required to establish civil liability; the rule in civil liability being based upon the "preponderance of the evidence," while in criminal cases one must be convicted "beyond a reasonable doubt." State v. Salterfield, 198 N. C. 682, 153 S. E. 155.

Culpable or criminal negligence has been defined in the Oklahoma cases above cited as follows:

"The omission to do something which a reasonable or prudent person would do, or the doing of something which such a person would not do under the circumstances surrounding the particular case."

In civil liability, we also have the doctrine of the "last clear chance," which may be taken into consideration in criminal cases in determining the guilt of the defendant. This rule, however, is not involved in the instant case, because the evidence here reveals that the collision occurred in such a short space of time after the danger was discovered that the rule could not apply. Burlie v. Stephens, 113 Wash. 182, 193 P. 684.

But the question of "proximate cause," which has application in both civil and criminal liability, plays a most important part in the case at bar, by reason of the facts. Here we find the undisputed evidence of both the state and the defendant that the collision occurred on the east side of the center of the highway; that the car of the defendant was traveling north on the east and right side; that the car in which the deceased Mollie Cecil Wilson was riding was traveling south, and also on the east, which was the wrong side of the highway. The collision occurred just after defendant's car had topped the brow of the hill, and a distance of not to exceed 100 feet from the crest of the hill. The driver of the Buick car testified that his first observation of defendant's car was the dust

just at the top of the hill, and defendant testified it was at this point that he observed the Buick. It was impossible to pass to the right of the Buick, by reason of the condition of the road. That acting in an emergency, the defendant attempted to turn to the left, and Wilson also testified that, acting in an emergency, he attempted to turn to the right and the cars collided head-on.

We are aware of the well recognized rule of law in civil cases that the question of proximate cause is generally a question for the jury. This rule of law also has application in criminal cases. But there must be evidence of its application. In criminal cases, it has been universally held that speed alone, even though it be in contravention of a statute, may not cause one to be guilty of a crime.

It has been universally held that a person may be found guilty of criminal homicide arising from the negligent operation of an automobile or its use for an unlawful purpose, or in violation of law, but it is uniformly held that it must be shown that such negligent operation, or use for an unlawful purpose or in violation of law, was the direct and proximate cause of the death; that is, that there was a causal connection between the act and the death. 99 A. L. R. 772; Dunville v. State, 188 Ind. 373, 123 N. E. 689; People v. Barnes, 182 Mich 179, 148 N. W. 400; Shaw v. Wilcox (Mo. App.) 224 S. W. 58; State v. McIvor, 1 W. W. Harr. 123, 31 Del. 123, 111 A. 616; State v. Long, 7 Boyce, Del., 397, 108 A. 36; People v. Black, 111 Cal. App. 90, 295 P. 87; State v. Schaeffer, 96 Ohio St. 215, 117 N. E. 220, L. R. A. 1918B, 945, Ann. Cas. 1918, E 1137; Jackson v. State, 101 Ohio St. 152, 127 N. E. 870; Norman v. State, 121 Tex. Cr. R. 433, 52 S. W. 2d 1051: O'Mally v. Eagan, 43 Wyo. 233, 2 P. 2d 1063, 77 A. L. R. 582; Hiller v. State, 164 Tenn. 388, 50 S. W. 2d 225.

There can be no doubt, from the undisputed evidence in this case, that this collision would have occurred regardless of the rate of speed of defendant's car, taking into consideration the rate of speed of the other car, and the distance between the cars at the time the danger was discovered.

When the state closed its case, the only evidence offered with reference to the speed of defendant's car had been that of the husband of the deceased Mollie Cecil Wilson. On direct examination he at first testified that he did not know the speed; on being further questioned he stated that he could not see the speedometer of defendant's car; and he then testified that it was coming very fast, and stated in his opinion 60 or 70 miles per hour. Taking into consideration the position of the witness, this evidence is very unreliable, and can at best be only a guess. He estimated that his car was traveling about 25 miles per hour.

At the close of the state's evidence, a demurrer was offered, which was overruled and exception saved.

Defendant testified, as did two of the occupants of his car and the witness Hardimon, that he was traveling from 30 to 40 miles per hour. On rebuttal the state offered the evidence of A. F. Fleming, who testified that he was traveling south and met a car in the depression south of where the collision occurred, a distance of about a quarter of a mile, and that he estimated the speed of the car at 60 miles an hour. While he did not identify it as defendant's car, this evidence was admissible as a circumstance for the consideration of the jury. And it is the testimony of this witness that is principally relied upon by the state to uphold the conviction in this case.

Glenn Cochran, a highway patrolman, also testified in rebuttal that after the collision he examined the cars,

and the condition of the road, and testified as an expert that from the condition of both cars, he estimated that the car of defendant was going 65 to 70 miles an hour at the time of the collision, and that the car in which deceased was traveling was going "at a moderate rate of speed." This evidence may have been admissible, and especially in a civil case, but it is of little value in a criminal case, and especially where it alone is depended upon to find one guilty beyond a reasonable doubt.

With reference to the testimony of the witness Fleming, his testimony was that he passed the car of defendant at the bottom of the hill south and a distance of about a quarter of a mile from where the collision occurred. One could almost take judicial knowledge that in this distance the speed of a car could be changed, and that one passing over the brow of the hill would naturally slacken his speed.

One Wiggins Hardimon testified for the defendant that he was going south and passed the car of the defendant just before he approached the brow of the hill. The state seemed to contend that the witness Hardimon was not present, as testified, and the defendant seemed to contend that the witness Fleming was not present. While this was a conflict in the evidence and these conflicts are often left to the jury, from the conclusion which we have reached, this evidence is of little value. As stated above, this collision would have occurred under the facts and circumstances regardless of the speed of the cars. The question of the proximate cause is the question at issue, and from a careful examination of the record and the facts and circumstances and the law applicable thereto, we have come to the conclusion that the proximate cause of this collision was the fact that the Buick car, driven by the husband of the deceased, was on the east

side of the highway, which was the wrong side of the road, when he was traveling south. That under the facts and the law in this case, as announced by the decisions above cited, it was the duty of the court to have sustained the demurrer to the evidence, and instructed the jury to find the defendant not guilty. This for the reason that the evidence was insufficient to show that this defendant was guilty of culpable or criminal negligence to that degree which would justify his conviction under the statutes of this state. To so hold would endanger the liberty of every citizen of this state who was driving a motor vehicle as a reasonable and prudent person should under the terms of the statutes above quoted.

We have called attention to the importance of the decision in the case to the citizenship of Oklahoma, with the thousands upon thousands of cars traveling daily upon the highways of the state. The facts as they exist here could easily confront any citizen who drives a car at almost any time. Men who never contemplated that they would ever be charged and tried for the commission of a felony constantly face this manslaughter statute. It is a hard statute, but it must be enforced as is any other criminal statute.

The question of being under the influence of intoxicating liquor does not enter this case. It has been consistently held that where one is guilty of driving a motor vehicle while under the influence of intoxicating liquor, he may be found guilty, not only of manslaughter, but of murder. Many of the Oklahoma cases heretofore cited involved the question of where one was driving while under the influence of intoxicating liquor, or where the evidence revealed that the driver of the motor vehicle was guilty of culpable or criminal negligence which justified this court in affirming the judgment and sentence of the

trial court. But the evidence in the instant case does not justify this action.

As stated above, we have examined many cases and text books bearing upon the issue here involved. It has been very interesting and instructive. They announce the rules which we have heretofore stated. We desire to call attention to a few of the leading cases heretofore cited.

In the case of O'Mally v. Eagan, supra, the facts are very similar to the facts in the case before the court. That was a civil action for damages, instituted by Carma O'Mally against Don Eagan and Phillip S. Mahoney, the drivers of the two cars involved. The case was tried against Mahoney alone, and the jury returned a verdict for the plaintiff for $7,700. The court set this verdict aside, and on motion entered judgment for the defendant, and plaintiff appealed. The accident was the result of a head-on collision between a Buick and a Chevrolet automobile. The plaintiff, a passenger in the Chevrolet, was injured, and another passenger in that car was killed. The Buick car, driven by the defendant Mahoney, was traveling east on the south and right side of the road; and the Chevrolet, driven by Eagan, and in which the plaintiff was riding, was traveling west, but also on the south, or the wrong side, of the road. The condition of the road was similar to that in the instant case, there being a deep ditch and a fence which prevented the Buick from turning to the right to avoid the collision with the other car. There was one material fact in that case that did not exist in the case at bar. The two cars were approaching a bridge, and each driver saw the other when without about 150 feet of the bridge. They were traveling at about the same rate of speed, and would have reached the bridge at about the same time. The defendant testified that when he dis-

covered their peril, he was within 50 feet of the Chevrolet. He then applied his brakes, and turned his car to the left "immediately before the accident to try to avoid him." [43 Wyo. 233, 2 P. 2d 1065, 77 A. L. R. 582.] This was exactly the action of the defendant in the instant case; and there are many other similar facts in the two cases. The court made an exhaustive research of the authorities, and affirmed the action of the lower court. For the sake of brevity, we will not quote the entire case, but desire to give some excerpts from the opinion, as follows:

"The main question in this case is as to whether or not the liability of the defendant was for the jury, and whether the court, accordingly, erred in entering a judgment notwithstanding the fact that a verdict was found for the plaintiff. Before she can recover in this case, she is compelled to show not only that the defendant Mahoney was negligent, but also that such negligence was the proximate cause of the injury. 45 C. J. 1168. It is claimed herein that the defendant was negligent in driving his car at an unlawful speed, in not having it under proper control, in not driving it in such careful manner as to avoid the collision, and in not stopping. Section 3, ch. 158, Sess. Laws 1925, provides that no person shall operate a motor vehicle on any public highway at a speed greater than is reasonable; that he shall at all times have it under absolute control; and that a speed in excess of 35 miles per hour shall be prima facie evidence of failure to operate the vehicle at a speed that is reasonable and proper. We may, for the purpose of this case, admit that these provisions were violated, and that the defendant traveled in fact at the rate of 40 to 45 miles . . . per hour, or more. But we should add here that upon such assumption, in view of the fact that both cars involved herein arrived at the bridge about the same time, we must also assume that Eagan's car traveled at the same rate. Eagan's negligence, of course, could not excuse the defendant's, in so far as liability to the plaintiff is concerned.´ Hester v. Coliseum Motor Company, 41 Wyo. 345, 285 P. 781. But such negli-

gence has a definite bearing on the question as to whether or not the accident could have been avoided, if the defendant had not been negligent in his speed, or—which comes to practically the same thing herein—in not having his car under control.

"Conceding, as mentioned, the defendant's negligence as above stated, it must be determined as to whether or not it was the proximate cause of the injury, or one of the proximate causes thereof. Ordinarily that question is for the jury. Hines v. Sweeney, 28 Wyo. 57, 201 P. 165, 1018; 45 C. J. 1168. That is true where different inferences may fairly be drawn even though the evidence is undisputed. But it is a question for the court where but one inference and conclusion can be drawn from the evidence; and whether only one inference may be . . . must necessarily ultimately rest with the court, for otherwise the jury would at all times have the right to arbitrarily determine the point. The proximate cause need not, of course, be shown by direct testimony; it may be determined from the circumstances in the case; but in view of the fact that the burden of proof rests upon the plaintiff, such circumstances must appear from the evidence. In the case at bar there is no direct testimony; if defendant's negligence was in fact the proximate cause of the injury, it must be gathered from the circumstances shown herein. Now, speed or any other alleged negligent act of the defendant cannot, of course, be said to have been the proximate cause, unless the accident could have been avoided in the absence thereof. And counsel for the plaintiff ought to be able to point out, by analyzing the circumstances shown by the evidence, how the defendant would have been able to have avoided the collision, had he been in the exercise of reasonable care. But counsel have wholly failed to do so, though they have repeatedly asserted that the jury might have rightly found that the defendant's negligence contributed to the injury in this case. So we shall proceed, and ourselves, by an analysis of the facts, attempt to determine the truth. The presumption is that the action of the trial court was right. This presumption is strengthened in the case at bar by

reason of the fact that the map used at the trial in connection with vital testimony was not introduced in evidence, and the trial court may, accordingly, have had a better view of the situation than we could have. And we must, in order to reverse its action, be able to point out how the collision might not, in the minds of reasonable men, have taken place, if the defendant had been in the exercise of care.

"Let us first consider the question of speed in the abstract. We pointed out in Christensen v. McCann, 41 Wyo. 101, 109, 282 P. 1061, that excessive speed does not lead to liability, unless it was the proximate cause of the injury. And that is the universal rule. Blashfield [Cyclopedia] of Automobile Law [vol.] 2, [§ 16], p. 1221. In many, perhaps the majority of, accidents, unlawful speed is, or may reasonably be said to be, a contributing cause, but that is by no means true in all. The point has been discussed a number of times in connection with cases where one of the parties, as Eagan did in this case, traveled on the wrong side of the road. That was true in Stobie v. Sullivan, 118 Me. 483. 105 A. 714. The court said in part: 'The vital point of inquiry, however, is whether the collision took place on the north side of the road, which was Stobie's proper side as he was traveling westward from Hampden towards Waterville, or on the south side, which was Sullivan's proper side as he was going northerly toward Bangor. If each had been on his own side, no trouble would have occurred, as the highway at that point was a state road, straight, wide, smooth, and well wrought. It was not the speed of either party that was the proximate cause of the accident, but the position of one car or the other on that side of the road where it did not belong. Bragdon v. Kellogg, 118 Me. 42, 105 A. 433, 6 A. L. R. 669.' . . .

"In Burlie v. Stephens, 113 Wash. 182, 193 P. 684, 686, while unlike in many of its facts to the case at bar, illustrates this principle, where the court said in part: 'But if it should be conceded that at the time of the collision the automobile was traveling at the rate of 20 miles

an hour, and that such speed was in violation of the state laws and city ordinance, yet there is not a word of testimony showing, or tending to show, that the speed of the car had anything to do with the collision. The record shows that the collision would have occurred, whether the automobile was traveling at the rate of 10 miles or of 30 miles an hour. There was no danger at all, regardless of the speed of the car, until the boy suddenly turned in front of it at such close proximity to it as that the collision was inevitable. The violation of a speed ordinance or [the] statute is not, in itself, sufficient to make the driver of the automobile liable in damages in the event of a collision. There must be something more; it must appear that such violation was the proximate cause of the injury. There is absolutely nothing in this case to show that the speed of the car was the proximate cause of the injury. We feel confident, therefore, that the court was correct in taking away from the jury the question of the speed of the automobile.' . . .

"Speed, considered by itself, cannot, accordingly, be said to have necessarily contributed to the accident in question. That is clear when we bear in mind that if the defendant had traveled at a lawful rate of speed, but had started a few minutes earlier, he would have been at the place of the accident just the same. The speed, therefore, considered by itself, may have been merely a condition of the accident, and remote in the chain of causation, from which no liability arose. Lemos v. Madden, 28 Wyo. 1, 17, 200 P. 791. Something more must appear in order that it may be said to have contributed to the accident, as, for instance, the duty to stop, the inability to do so by reason of the excessive speed, and that, had defendant stopped, the accident could have been avoided. It is, in fact, argued by counsel for the plaintiff that these factors were present in the case at bar, and in that connection it is further argued that it was for the jury to say as to whether or not the defendant should have sooner observed that the Eagan car would not turn out to its right side. Now attention need hardly be called to the law of

the road, as universally observed in the United States, and as expressed in section 4, c. 158, Sess. Laws of 1925, that 'whenever any person, traveling with any vehicle or conveyance on any road or public highway in this state, shall meet another vehicle or conveyance traveling in the opposite direction it shall be the duty of the driver of such vehicle or conveyance to turn promptly to the right of the center of the traveled road. . . until such vehicle or conveyance has passed.'

"It is said in Berry on Automobiles (5th Ed.) § 252, that: 'One who violates the law of the road by driving on the wrong side assumes the risk of such experiment and is required to use greater care than if he had kept to the right side of the road. If a collision takes place under such circumstances, the presumption is against the party who was on the wrong side.'

"And in Blashfield [Cyclopedia] of Automobile Law [vol] 1 [§ 231, p. 416, the author says: 'A motorist has a right to presume that the driver of a vehicle coming from the opposite direction will obey the law, and to act upon such an assumption in determining his own manner of using the road; and a driver, therefore, proceeding on the right side of the traveled way, may assume that the driver of a vehicle approaching on the same side, or on his left side, will yield half the way, or will turn out in time to avoid a collision, and not force him, in violation of the statute or ordinance, or the law of the road, to turn from the part of the road, on which he is lawfully driving, until he sees or ought to see, that such assumption is unwarranted.'

"According to this authority, therefore, the time may come when a person traveling on the right side of the road ought to observe that the person coming from an opposite direction will not obey the law. Nevertheless, as was said in Shaw v. Wilcox, Mo. App., 224 S. W. 58, 59, 'a condition of discoverable peril must have existed.' The rule is stated in Huddy, Encyc. of Automobile Law (9th Ed.) vol. 304, § 116 thus: 'A driver on the right side of

the road has a right to assume that a vehicle approaching on the wrong side will turn to the proper side in time to avoid a collision, unless it is obvious that the driver of the latter vehicle does not intend to turn, or is unconscious of the danger which is imminent.'

"In Albright v. Joplin Oil Co., 206 Mo. App. 412, 229 S. W. 829, 830, the court said: 'We are of the opinion that the driver of the truck had a perfect right to continue down the street, the deceased showing no evidence of being oblivious to the danger of remaining on the wrong side, and that he had every reason to believe that, as they were approaching each other, they could see each other, and that he would further have a right to rely on the fact that the deceased, being on the wrong side of the street, and seeing the truck approach, would use reasonable exertions to turn out of the way, and exercise that degree of care for himself which any ordinarily prudent person is expected to use. The fact, therefore, of itself that the deceased was in the street, on the wrong side thereof, when there was no appearance of his being oblivious to the oncoming truck, would not place a duty on the driver of the truck to slacken his speed or change his course, so long as he was on the right side of the street, where he belonged, and within the law and the traffic rules, until he reached a place where it was apparent to the driver of the automobile that the deceased was unconscious of his oncoming danger, or, although duly alive to the danger, he was unable to get to a place of safety.'

"And in Cook v. Standard Oil Co., 15 Ala. App. 448, 73 So. 763, the court said on the point here discussed: 'The plaintiff had the right to assume that the driver of the wagon would rein his team to the right-hand side of the road, so as to permit the plaintiff's vehicle to pass, until it became obvious that the driver was making no effort to do so or the danger of a collision was imminent.'

"In the case at bar Eagan was traveling on the wrong side of the road. It was night. Defendant had his lights burning. Eagan must have seen him coming, unless he

344

was out of his senses, which he probably was. But defendant did not and could not know it. So far as the record shows, there was nothing whatever which would indicate to defendant that Eagan would not obey the law; nothing that was calculated to overcome the presumption mentioned. To hold that under these circumstances the jury had a right to say that defendant should have known sooner than he did that Eagan would not turn out would be contrary to the general rule that the jury's decision must be based upon evidence, and would leave them an arbitrary discretion which is nowhere warranted in the law. To give them such power would, we fear, so unsettle the 'law of the road,' as to lead to dangerous consequences, and bewilder all travelers in automobiles in knowing when or when not to rely on the fact that the person coming from the opposite direction will obey the law. We think, accordingly, that defendant cannot be held to have been negligent in no sooner determining that Eagan would not turn out. That was, when he was about 50 to 58 feet distant, or, as stated by him in another place, just an instant before the collision. The same reasoning applies to defendant's duty to stop. He could not be held to have been negligent until he saw or could have seen that Eagan would not obey the law. That, we think, is clear. Some of the cases go even farther than that. In Shaw v. Wilcox, supra, the defendant was on the wrong side of the road. The collision occurred when the plaintiff, thinking that the defendant would not turn to his proper side, suddenly veered to the left, and the defendant at the same time turned to his right. The court said among other things: 'Plaintiff was on the proper side of the street, and, while he could not blindly and heedlessly drive into a car, even if improperly using that side of the street, yet he had a right to expect, and to act on the theory, that defendant would turn to the right and go to his proper side in passing. . . . As we have stated, plaintiff was on the proper side of the street, and had a right to expect defendant to turn to his right and clear plaintiff's way. The duty of the plaintiff to stop or take such other precaution only arose when by due care plaintiff discovered that de-

fendant could not or would not himself turn to the right and clear plaintiff's way. A condition of discoverable peril must have existed. Indeed, we doubt if a duty to stop on plaintiff's part ever arose in this case, as such duty only arises when it becomes apparent to plaintiff that he might not be able to avoid a collision by himself turning his car to the left and going around the defendant."

"The accident in the case of Goodson v. [Schuster's Wholesale] Produce Co., 10 La. App. 486, 120 So. 689, 691, happened in a similar manner, and the court said: 'In the case at bar, defendant's truck was on the wrong side. On meeting plaintiff's car, the driver failed to turn in time to avert the collision, and no reason has been or can be suggested why he should not have done so. He was therefore negligent, and that negligence was the efficient, prime cause of the collision and resulting injury. . . . It may be argued that plaintiff, having seen the truck at some distance approaching on the wrong side of the road, could and should have turned before he did and thereby averted the collision, or that he should have stopped his automobile on his side of the road. But, as already stated, the appearances were such as to cause a reasonably prudent man to believe that if he stopped the truck would run over him. As to whether he should have turned to the left sooner than he did, it must be said that he had a right to assume that the driver would observe the law and turn to his side of the road.'

"The accident in the case of Kennedy v. Opdenweyer, 11 La.App. 532, 121 So. 636, 639, 123 So. 906, also happened in a similar manner; the plaintiff's car, in that case, being on the wrong side of the road. The court, holding that defendant was not in any way to blame, reversed the verdict of the jury and entered one for the defendant, saying in part: 'From the foregoing testimony, facts, and circumstances it is therefore clear that defendant was forced by Kennedy, who was driving on the wrong side of the highway, to suddenly veer his sedan to

his left side and to dash across the road to avoid a head-on collision. . . . The law of the road requires each to drive on his right side. Laymen all know this rule, and cannot plead ignorance of it. Defendant had therefore the right to rely on that rule in this case and to expect that Kennedy would have turned to his side of the road, and was not in duty bound to stop his car. The gross negligence was on the part of Kennedy and not on defendant who was forced by the fault of the former to veer his course to the left as before explained. * * * The facts here show conclusively that, if the collision occurred on Kennedy's side of the road, defendant was forced there to avoid a head-on collision by the gross negligence of Kennedy, and that the conduct of defendant was entirely unjustifiable and excusable under the circumstances. . . Likewise it can be said here that the swerving by defendant was brought about by Kennedy, plaintiff's deceased husband. The defendant here was confronted with an emergency, was suddenly placed in a perilous situation, and, to avoid the impending danger, with little time to think or reflect, dashed across the road, and in which it must be held that he pursued the proper course and exercised ordinary care under the circumstances. See, also, Smith v. Interurban Transp. Co., 5 La. App. 704."

The court then holds that the doctrine of "last clear chance" had no application in the facts in this case, stating:

"We have not, accordingly, any more than counsel for plaintiff, been able to discover any method by which the defendant, had he been in the exercise of reasonable care, could have avoided the accident. At least, no method is pointed out by the evidence, and the negligence of the defendant, if any, cannot, therefore, be said to have been one of the contributing—the proximate—causes of the accident. The doctrine of the last clear chance can have no application here. When the defendant discovered the peril which he, his fellow passengers, and the occupants of the Chevrolet car were in, but a moment's time intervened until the collision occurred. The defendant thought that

there were two or three seconds. He was wrong; there was not nearly that time, less than a second intervened. The doctrine mentioned can never apply where the party charged is required to act instantaneously, and if the injury cannot be avoided by the application of all means at hand after the discovery of the peril, or as some would hold, after the peril should have been discovered, at least in cases in which, as in the case at bar, any previous negligence of the party charged cannot be said to have contributed to the injury. Burlie v. Stephens, supra; Southern Express Co. v. Roseman, 206 Ala. 681, 91 So. 612; Bazile v. J. F. Landry & Co., supra [10 La. App. 747, 122 So. 901]; Kennedy v. Opdenweyer, supra; see 45 C. J. 880, 993. That is clearly the situation here. We cannot, of course, help but sympathize with the plaintiff, who, through no fault of hers, has been injured. But the blame, according to the evidence in this case, rests with the driver of the car in which she rode. We think the court was right in entering judgment notwithstanding the verdict of the jury, and we see no alternative but to affirm it. An order to that effect will be entered."

This was a civil case, but the law announced therein has application to the question here involved. Certainly stronger evidence should be required to convict one beyond a reasonable doubt than by a preponderance of the evidence.

We now desire to call attention to a case decided by the Supreme Court of Tennessee, Hiller v. State, 164 Tenn. 388, 50 S. W. 2d 225, 226, in which the facts are almost identical with those presented here. We quote:

"This was a conviction of involuntary manslaughter with a jail sentence of eleven months and twenty-nine days. In a collision between the Chevrolet car of plaintiff in error and the Ford car of J. W. Jonakin, the infant child of Mr. Jonakin and Mrs. Jonakin, being carried in the arms of the mother at the time, met its death. The unfortunate tragic result of the collision naturally tends

to render more passionate human judgment in weighing the conduct of the accused.

"It must be borne in mind as said by this court, in Copeland v. State, 154 Tenn. [7], 11, 285 S. W. 565, 566, 49 A. L. R. 605, in disposing of a charge of criminal liability in a case of automobile accident killing, that: 'Allowance must always be made for misadventure and accident, as distinguished from culpable negligence;' and it is uniformly held that the kind of negligence required to impose criminal liability 'must be of a higher degree than is required to establish negligence upon a mere civil issue.'

"The collision occurred in March, 1929, on the crest of a hill on a graveled highway, 35 feet wide, some six or seven miles east of the town of Obion, about 1:30 p. m. Mr. Jonakin had left Obion shortly before in his Ford roadster which he was driving. Hiller was a salesman traveling out of New Orleans, about 50 years of age, whose character for truth and veracity is shown to have been excellent. The state's theory is that he was driving at an excessive rate of speed and on his left-hand side of the road; and that Jonakin was driving very slowly on his extreme right-hand side, where he should be. The only eye witnesses to the crash were Jonakin and his wife and Hiller, who puts his speed at about 25 miles, and who insists he approached the crest of the hill well over on his right side, and that first seeing Jonakin's car some 30 to 35 feet distant as they came over the hill, driving on Jonakin's left, to avoid a head-on collision, there being a ditch on his right, he swerved to the left in an effort to pass, and that at the same moment Jonakin, seeing Hiller's car, and realizing that he (Jonakin) was on his wrong side, quickly jerked his car to his right, striking Hiller's car about the right rear fender.

"All parties testifying agree that after the collision the cars were in respective positions supporting Hiller's testimony. His car rested on or against an embankment on the north side of the road, which ran east and west,

while Jonakin's car was turned toward the north, headed into the rear of Hiller's car. An apparently intelligent and disinterested witness named Watts, a stranger to all parties, who reached the scene shortly after the collision, prepared at the time a plat, or diagram, which is in the record, and which is approved by other witnesses, which not only clearly shows the positions of the cars afterwards, but also indicates clearly the course of both cars as they immediately approached each other. This testimony and drawing made at the time strongly sustains the testimony of Hiller that he was driving up the hill on his extreme right, the south side of the road, but that Jonakin was driving up the hill on his left, the same south side, and that both drivers turned to the north side of the road at about the same time, resulting in the collision.

"The theory of the prosecution appears to rest on either (1) reckless negligence shown by high speed and left-hand side driving, when approaching the crest of a hill, or (2) violation of the 30-mile speed limit statute, repeal of which did not take effect until some 30 days later.

"The only evidence that Hiller was exceeding the speed limit at the place of the meeting is that of Mr. and Mrs. Jonakin, who estimate his speed at from 50 or 60 miles an hour. Mr. Jonakin's testimony on this point is unsatisfactory. He makes confusing and contradictory statements as to the distance at which he first saw Hiller's car approaching. (The same may be said of the evidence of the husband of the deceased in the case at bar.) In view of the grade of the road established in the record and the extent of the hill up the opposite sides of which the cars came, it is hardly possible that the occupants of either car could have seen the other until within a very short distance of each other. And, naturally, startled by seeing suddenly an approaching car threatening a head-on collision, anything like an accurate estimate of its speed would be impossible. Moreover, unquestionably Jonakin's attention was directed instantly to the futile effort he made to get his car across the road. We are unable to find any satisfactory or dependable evidence that Hiller

was exceeding the speed limit of 30 miles. But, if it be conceded that he was exceeding the speed limit, it can hardly be said on this record that this was the proximate cause of the collision. As already indicated, we think the weight of the evidence shows that Mr. Jonakin's car was at the time on his left-hand side, and that this, together with his too late effort to cross over to his right, was the cause of the collision.

"The question is not one of contributory negligence on the part of Jonakin—not a defense in a criminal case—but the mere violation of the statute will not sustain a conviction of manslaughter when it appears that the killing was not the natural or probable result of the unlawful act. See Holder v. State, 152 Tenn. 390, 277 S. W. 900, where the authorities are reviewed and the distinction is pointed out between unlawful acts malum in se and those merely malum prohibitum, to which driving beyond the speed limit fixed by law belongs. And this distinction was further emphasized in Keller v. State, 155 Tenn. 633, 299 S. W. 803, 59 A. L. R. 685, which classified driving while drunk as an unlawful act malum in se.

"Nor can it be said that Hiller was guilty of criminal negligence in turning to his left after seeing the other car. If too near together to stop successfully, his movement to the left was certainly not more than an error of judgment. Witness Watts testified that Jonakin passed him a mile or two out of Obion, and that he followed the Jonakin car to the point of the collision; that Jonakin's car gradually drew away from him; that he was driving between 25 and 30 miles an hour and the Jonakin car somewhat faster, until the cars were from a quarter to a half mile apart when the collision occurred. He says that he observed and was impressed by the fact that Mr. Jonakin drove much of the time on the left, instead of the right side. This Mr. Jonakin denies, but a driver frequently does this unconsciously and inadvertently. And a circumstance tending to explain this and sustain Mr. Watts is that the gravel road, some 35 feet wide, was being scraped and had been freshly gone over on the south side, rendering this

the more inviting side for driving. But, however this may be, we think the weight of the evidence clearly shows that Mr. Jonakin was crossing from his left to his right, from the south to the north side, when the cars met. Without further reviewing the evidence, we are of the opinion that the preponderance of the evidence is against the verdict."

In the case of Jackson v. State, 101 Ohio St. 152, 127 N. E. 870, the Supreme Court of Ohio said:

"At the request of the state, and before argument, the court gave the following special charge to the jury:

" 'I charge you that if you find from the evidence in this case beyond a reasonable doubt that the defendant, Van Jackson, while operating an automobile, struck and killed the deceased, John Schademan, and you further find beyond a reasonable doubt that at the time he struck the said John Schademan, the defendant was operating the automobile in a municipality in Hamilton county, Ohio, at a rate of speed greater than 15 miles per hour, it is your duty to find the defendant guilty of manslaughter.'

"It will be observed that the charge above quoted warranted the jury in finding the plaintiff in error, Van Jackson, guilty of manslaughter, if they should find that he, while operating his automobile at a greater rate of speed than 15 miles per hour, struck and killed the decedent, irrespective of whether the rate of speed was the proximate cause of the killing; and, since this proposition of law was in no way modified by the general charge, the square question is raised here as to whether an accidental, unintentional killing of a person by another engaged in an unlawful act makes that person guilty of manslaughter under the statute, irrespective of any connection between the unlawful act and the unintentional killing, and it seems to this court that an analysis of the illogical and absurd results which would necessarily follow the recognition of such a rule will answer the query. For

352

instance, if it be the law, as charged by the trial court in this case, that, if the jury find the accused unintentionally struck and killed the decedent, while engaged in an unlawful act, to wit, operating his car at a greater rate of speed than 15 miles per hour, they must find him guilty of manslaughter without reference to causation, then it must follow that if the accused had been violating any other valid statute, however, unconnected with the death at the time of the unintentional killing, he would be guilty of manslaughter. For instance it is a violation of a valid statute to operate a motor vehicle without having first registered same with the secretary of state, and it is a violation of a valid statute to operate a motor vehicle without a placard bearing the registration number, displayed on both the front and rear of such automobile, securely fastened so as not to swing, yet, under the charge of the court, should the driver of an automobile, while driving his car—without first having registered it with the secretary of state, or, having registered, without having the registration placard displayed on the rear of his car or securely fastened so as to prevent swinging—at the rate of 4 or 5 miles per hour, and while in the exercise of the utmost care and caution, be so unfortunate as to unintentionally run over and kill a person, who inadvertently or purposely projected himself in front of the car, he would be guilty of manslaughter; for clearly it would be an unintentional killing by a person operating a car in the violation of a valid statute. And yet there would be no relationship between the violation of the statute and the death. The accident would have occurred just as surely had the motor vehicle been registered or the placard securely fastened and displayed on the rear of the car. The same observation might be made with reference to the absence of a red light on the rear of the car during the night season. Under the charge as given a driver of a motor vehicle operating a car at 15 1/100 miles per hour in the sparsely built-up portion of a city would be guilty of manslaughter were a man suddenly to drop from a balloon immediately in front of the car and be killed by the car, although the man would just as surely have been

killed had the driver of the car been operating the same at the rate of 14 99/100 miles per hour. The proximate cause would have been the same in each case, although the result to the driver of the car would have been the appalling difference between criminal guilt and legal innocence.

"We are unable to comprehend the consistency of a rule which would justify the conviction of the surviving party to a fatal accidental collision that would not, upon the same state of facts, entitle the representative of the decedent to recover a judgment in a civil action for wrongful death. Surely we have not reached a point in the administration of justice where a man's liberty is less sacred than his property.

"We adhere to the following pronouncement in the case of State v. Schaeffer, 96 Ohio St. 215, 117 N. E. 220, L. R. A. 1918B, 945, Ann. Cas. 1918E, 1137:

" 'The unlawful act relied upon as the predicate for manslaughter must be the proximate cause of death. If death resulted from any other cause, or there be a reasonable doubt as to the unlawful act being the proximate cause of death, the jury should acquit.'

"We hold that in a prosecution for manslaughter, on account of the unintentional killing of a human being by striking him with a motor vehicle, while the motor vehicle is being operated in violation of a valid statute, a charge of the court which eliminates from the consideration of the jury the question whether the violation of the statute was the proximate cause of the death of the decedent is prejudicial and reversible error."

The defendant did not except to any of the instructions given by the court in this case. He only excepted to the refusal of the court to give the instructions requested by him. And as above stated, the correct principles of law announced in the requested instructions were fairly covered in the instructions of the court.

In instruction No. 5, to which there was no exception, the court, in its charge defining manslaughter in the first degree and applying as applicable thereto the reckless driving statute which declares a violation thereof to be a misdemeanor, instructed in practically the same terms as the instruction quoted in the Jackson Case. But as above stated, there was no exception to this instruction, and the defendant was not convicted of manslaughter in the first degree, and while this instruction should have included the proposition that although defendant might be found guilty of manslaughter in the first degree if committing a misdemeanor, yet the jury must also find that this act was the proximate cause of the injury. But the court in instruction No. 7, and to which there was no exception, instructed the jury upon the question of manslaughter in the second degree, and defined the term "culpable negligence," instructing the jury that if they found the defendant did "operate his automobile in a culpably negligent manner, as hereinbefore defined, so as to proximately cause the same to strike the 1935 Buick sedan," etc., that he should be found guilty of manslaughter in the second degree. While this instruction uses the word "proximate cause," it does not in very understandable language submit the issue of proximate cause to the jury, by instructing them that it was their duty, if they found the defendant guilty of culpable negligence, that they should also find it was the proximate cause of the death of the deceased. But in instruction No. 10, to which there was no exception, the court instructed the jury that if they found that the defendant "was not guilty of any negligent or culpable act which proximately contributed to the death of the deceased, or if they entertained a reasonable doubt thereof," they should acquit him.

In a criminal case it might have been better if the court had used the word "caused" instead of "contributed to." But this instruction fairly covered the issue. The instructions taken as a whole were very proper and fairly presented to the jury the defense of defendant. As above stated, no exception was taken to any of them, and the defendant did not offer a requested instruction which covered the proximate cause issue.

We therefore would not reverse this case because of any error in the instructions, unless it had been such as to constitute a fundamental error which deprived defendant of a substantial right. But in the instant case we have found that the evidence was insufficient for the court to submit this cause to the jury, and for this reason the judgment and sentence of the district court of Oklahoma county is reversed, and the case remanded.

JONES, P. J., concurs. DOYLE, J., not participating.