No. 427

First Circuit

KENNEDY v. OPDENWEYER

(April 13, 1929. Opinion and Decree.)
(October 10, 1929. Rehearing Refused.)
(December 2, 1929. Writ of Certiorari and Review Refused by Supreme Court.)

Daspit, Huckabay & Blanche, of Baton Rouge, attorneys for plaintiff, appellee.

Taylor, Porter, Loret & Brooks, of Baton Rouge, attorneys for defendant, appellant.

MOUTON, J. A collision occurred between a Lincoln sedan and a Ford car on April 9, 1928, in the afternoon about 1:30, on the Jefferson Highway south of the Baton Rouge Country Club, a few miles south of the city of Baton Rouge.

The defendant was driving the sedan and Zimmie Kennedy, who was killed in the accident, was driving the Ford car.

There is a curve of about 8 degrees in the Jefferson Highway where the accident happened, but the road runs practically east and west. Defendant was going from the city of Baton Rouge and was traveling eastward, from which direction Kennedy was coming. The autos were therefore moving in opposite directions at the time of the collision.

Plaintiff brought this suit against defendant for $20,409.75, for herself individually and for the use of a minor child. The case was tried by a jury, which rendered a unanimous verdict in favor of plaintiff for the full amount claimed, and after the refusal of an application for a new trial, was confirmed by a judgment of the district judge.

Defendant appeals.

The curve where the accident occurred is 677 feet long, is not abrupt and offers no obstruction whatsoever to the view of travelers in either direction on that road which is a paved highway.

There is a white line about 4 inches wide which runs near the center of the pavement, being 10 feet from the north edge of the pavement and 13.6 feet from its south edge. There is a dirt shoulder on both sides of the pavement, measuring 6 feet on each side. The road, including the dirt shoulders, is therefore at this point a fraction over 35 feet wide.

As there was no obstruction on this highway in which there is a slight deflection from a straight line, it is therefore obvious that defendant and Kennedy saw each other's car at a safe distance from the point where the impact took place. In his original answer defendant alleged that as he was rounding the curve he noticed a Ford car which was approaching on the same side he was traveling, at a distance from his auto of approximately 100 or 150 feet.

A few minutes before the trial, the record shows that defendant, over the protest of plaintiff's counsel, filed an amendment to his answer, changing his figures from feet to yards, in reference to the distance he first saw the approaching car. This change in the answer had reference to the proof, in no way altered the substance of the demand, and was entirely permissible, as held below. C. P. 419, 420. Counsel for plaintiff, if we appreciate his position correctly, does not contend that the amendment was improperly allowed, but claims that the change obtained, as to the distance at which defendant subse-

quently claimed to have first seen the Ford car, militates severely against his veracity, as a witness in the case. The defendant stated frankly in his testimony that he had made a mistake in his original answer and merely desired to make the correction so that his statement might conform to the true state of facts. There is nothing reprehensible with respect to this explanation and which can in any way affect the credibility of defendant.

Plaintiff's counsel claims that at the time of the collision Kennedy was driving on the north side of the white line which runs near the center of the pavement, and was therefore on his right-hand side. In support of this contention he depends largely on the testimony of Will Norder.

.This witness says that Kennedy was driving ahead of him on the highway at a distance of about 150 yards; that he was not paying much attention to Kennedy; that about the distance above stated he turned his car in Essen lane, a driveway which runs from the south into the highway; that Kennedy was back of him, and that he did not see the collision, but heard the crash. Evidently, Kennedy could have crossed the white line on the side defendant's car was, and which Norder could not have seen situated as he was. It is obvious if Kennedy had been driving to the north of the white line and had continued in that direction when the cars reached the same point, the autos would have safely passed each other, and a collision would have been a physical impossibility. The situation then existing there accounts for the allegation in plaintiff's petition wherein she says in referring to defendant that he suddenly and without warning crossed the road over to his (Opdenweyer's) left-hand side, and drove "head-on" into the Ford touring car. The

proposition upon which she bases her contention for recovery is therefore that there was a head-on collision between the two cars.

Kennedy died the same night after the accident from the injuries he suffered as a result of the collision. The only eyewitnesses to the accident are the defendant and his wife, Mrs. Opdenweyer, who was sitting at the time on the front seat of the sedan next to her husband who was driving.

Defendant says he was driving on the south side of the road going east, which the record shows was on his right side. His wife makes the same statement. Mrs. McHardy, an elderly lady, lives near the highway on the south side of the white line, near enough to see the curve in the roadway. She saw when defendant's car passed her home, and says it was on the driver's right side. The fact is that she had gone inside after seeing the car, then heard the crash, went back on her gallery, but did not see the collision. According to Mrs. McHardy, it is therefore true that when defendant entered the curve he was traveling on his right side of the road. The very allegation of plaintiff's petition, that defendant "suddenly and without warning crossed the road to his, Opdenweyer's left hand side," makes it evident that defendant was driving on his right side, otherwise he could not have crossed to his (defendant's) "left-hand side."

Defendant says that his wife saw Kennedy first and told him to be careful, as a man was coming on the wrong side of the road. Defendant admits he saw Kennedy, that he kept on driving on the south side, and did not blow his horn, slow down his auto, or apply his brakes. He was then traveling, he says, at 30 miles an

hour which he saw registered on the speedometer; that Kennedy was coming at about the same rate of speed. He explains that he did not slow down or attempt to give any warning, as he expected that Kennedy would veer his car from the south side of the road to the north side of the white line which was Kennedy's right side. He explains that Kennedy was so much on defendant's side of the white line that defendant's passage way was blocked. He says he saw that in order to pass Kennedy he would have to get off on the dirt road, which he was going to do, when suddenly Kennedy veered to the south side, shutting off his pathway. If he had continued in the same direction, a head-on collision would have been inevitable, and, being thus imperiled by this emergency, for the purpose of avoiding the impending head-on collision, he says he suddenly swerved his car to his left side or to the north of the white line, and, as he did so, the Ford car turned in the same direction and at a point a little to the south of the white line, the left front wheel of the Ford car struck the right front or side of defendant's car.

The version given by Mrs. Opdenweyer of the occurrence is in this particular, and on the other important features of the case, practically the same as that testified to by her husband. She was riding on the front seat with her husband and was in a position to see what transpired just before and at the time of the impact. It was shown that the right wheels of the Ford which, after the collision, laid sidewise on the roadway, were in the air.

Counsel for plaintiff questioned Mrs. Opdenweyer in reference to the position of these car wheels. She stated she was under considerable excitement after this deplorable accident, that she was looking with solicitude at the unfortunate victim whom her husband was trying to extricate from the wreck, and that she could not remember in what position the wheels of the Ford car were at that time. Because of her inability to remember that fact, counsel seems to infer that her testimony as to what transpired before and at the time of the collision is unreliable. In an emergency of that character, what occurred prior to the accident would, in our opinion, remain indelibly impressed on the mind of one placed in Mrs. Opdenweyer's position, but facts in reference to the position of a car and much less its wheels, after the collision, would naturally be passed unnoticed in a moment of distress and excitement following such an occurrence.

Defendant testifies that after the Ford car had run into the sedan on its right side, the sedan continued on its course and ran into a ditch along the north side of the road. His wife's testimony is to the same effect. The sedan was seen there, rammed against the embankment of that ditch, by several witnesses who went to the scene soon after the crash. The proof is conflicting in reference to the spot or exact location of the Ford after the accident. It is difficult to fix the exact spot where it was at that time, whether on the white line, south or north of it. The preponderance of the evidence shows however that its rear wheels were on the white line with the major part of the body south of it, and that it was facing a southwesterly direction, while the Lincoln was standing on the side of the ditch on the north side of the highway, and opposite to the Ford. The proof is clear that the injury to the Ford was on its left side, and the damage to the sedan was on its right side.

Tom Dutton, one of the witnesses, testifies he was at the scene soon after the accident, and that the Ford car was dented on the left side of the radiator.

The exhibit made to this court shows that the radiator was dented on the side to which Dutton testified. The facts showing the damage on the right side of the sedan and on the left side of the Ford, which was coming from the east, that the Ford which was a much lighter car was turned around to the southwest, and that the sedan, the much heavier car, proceeded to the northeast across the road to the ditch on the other side where it stopped opposite the Ford, indicate quite clearly that a glancing blow occurred between the two cars just as defendant was as explained by him and his wife, endeavoring to cut across the road to avoid a head-on collision with Kennedy's car that had closed his passage to the south.

The sedan, as shown by the record, weighs 5,000 pounds. There is no proof how much the weight of the Ford was, but we can take judicial notice of the fact that it could not have weighed over 2,000 pounds. It is true that the left wheel of the Ford was broken, that the radiator was badly dented, and that it was severely battered, and turned on its side, with its right wheels in the air. If there had been a head-on collision, however, between these cars which were traveling in opposite directions at a speed each of 30 miles an hour, there would have been such a crash that the damage would not have been confined to the right side of the sedan and the left side of the Ford. The right side of the Ford, and the left side of the sedan would unquestionably have shown the effects of the impact. The chances are that the Ford would have been completely wrecked on the right as well as on the left side of the hood, radiator, wheels, or other parts of the car, with similar damages, perhaps of a less severe character, to the sedan, the much heavier car. Nor is there any probability that the sedan would have been deflected from its course in a head-on collision and have proceeded on a 45-degree angle, as appears from the evidence, across the pavement 10 feet from the white line and over 6 feet across the dirt shoulder to the embankment of the ditch on the north side of the highway. It is impossible to believe that a head-on collision could have had such results, but which are easily explained as being brought about by the two cars being veered to the north running diagonally and meeting in the attempt made to avoid a head-on collision. This explanation is therefore in harmony with the version of the occurrence given by defendant and Mrs. Opdenweyer.

There are, however, other witnesses in the case, who immediately, and some later, but soon after the collision, visited the scene, and who testify to certain facts which are strongly corroborative of the version given by defendant and his wife, and which are in keeping with the explanation revealed by the physical results of the accident to which we have above referred.

The accident, it is alleged by plaintiff, occurred about 1:15 p. m. Doyle Martin reached the scene a few minutes later; he says, between 1:30, 1:45 p. m. He testifies that he traced the tracks of the Lincoln car from the outside of the pavement on the south side of the road across the road to where the Lincoln car had stopped on the brink of the hill, on the north side of the highway. He says he saw big tracks across the road which ran at an angle of about 45 degrees and

where was left a deposit of fresh earth and oyster shells. He traced the tracks from the dirt shoulder on the south side of the road which he followed to the rear casing of the Lincoln car. The proof shows it had been raining. No doubt, the dirt on the south side shoulder of the road from where Martin had traced the tracks had been picked up by the Lincoln and had stuck to the tires and had been deposited across the pavement, as was explained by Martin. This witness is not a relative of the defendant, and has no interest in the outcome of this case, and is entirely disinterested as appears from the proof. He was, at that time, working for the highway commission, which accounts for the close observation he gave to what had happened.

Dr. Pipes was at the Heidelberg Hotel in Baton Rouge when the collision occurred. Mr. Dutton, son-in-law of Mrs. Opdenweyer, was immediately notified by phone of the accident. As a physician was called for, Mr. Dutton took the doctor immediately to the place of the wreck.

Dr. Pipes says there was a mud track diagonally across the road from near the Lincoln car. There was another track, not however quite so distinct, "leading from the south side of the road diagonally across the road to the Lincoln wheels." It really began, he says, a little off the concrete, as though one wheel had gotten off the concrete, and had come back on the road, "and then had gone across." Dr. Pipes is also an entirely disinterested witness.

Tom Dutton, son-in-law of the defendant, and his wife testify practically to the same facts in reference to the tracks that led to the Lincoln car.

Plaintiff's counsel brought two or three witnesses to show that due to the effects of the rain on the pavement the tires of the Lincoln car could have left no marks across the road, visible to the eye. These witnesses said they did not believe such tracks would have remained on the pavement, but were not positive that such could not have been the case. Even if in their opinion no tracks would have remained, testimony of that character cannot overcome the evidence of the witnesses who testified positively to the existence of these tracks, and to the direction in which they ran across the road.

In his testimony defendant says, to be certain, he was driving on the "sure side," that he might have been a few inches off the curb.

Mrs. Opdenweyer says, in order to allow the other car passage way, defendant pulled as far to the right as he could, and she thinks he went a little over the curb. She was on the right side, and was therefore in a position to see that the car had gone beyond the curb.

The fact that the other witnesses above named testify that the tracks of the Lincoln car had been traced by them beyond the curb on the south side of the road into the dirt shoulder, convinces us that defendant and his wife gave a correct version of what defendant had done to avoid the accident. When defendant saw that a head-on collision was inevitable, if he continued in his course, he dashed across the road to his left diagonally and left the imprints of the tires of his car across the road leading to the ditch on the other side, where they were traced by the witnesses soon after the accident.

Counsel for plaintiff says that defendant and his wife made statements at their examination before the coroner's inquest at variance with what they said on the trial. On the most vital issue of fact involved herein, defendant said at the inquest that as the Ford was coming on his (defendant's) right side of the road, it was suddenly veered to the defendant's left as he was trying to pass it; that he tried to pass him at his left which was the only thing he could do, and that the impact occurred near or on the white line. Mrs. Opdenweyer confirmed that statement, and in which we find no substancial variance from what these parties testified to during the trial. Nor are there any discrepancies as to the other facts testified to by them at the coroner's inquest.

From the foregoing testimony, facts, and circumstances it is therefore clear that defendant was forced by Kennedy who was driving on the wrong side of the highway to suddenly veer his sedan to his left and to dash across the road to avoid a head-on collision.

Counsel for plaintiff refers us to Goldsby vs. Lowrey, 6 La. App. 450, where he quotes from the decision to the effect that, when a party driving an auto sees another more than 100 feet away coming on the wrong side of the road, his duty is to stop within 10 or 20 feet of the other car, otherwise the party is guilty of gross negligence. If he had copied further from that decision, he would have seen that the court said it preferred not to decide the case on that point. If, however, the court intended to so hold, we must say that we cannot agree to that doctrine. The law of the road requires each to drive on his right side. Laymen all know this rule, and cannot plead ignorance of it. Defendant had therefore the right to rely on that rule in this case and to expect that Kennedy would have turned to his side of the road, and was not in duty bound to stop his car. The gross negligence was on the part of Kennedy and not on defendant who was forced by the fault of the former to veer his course to the left as before explained.

Another contention of counsel for plaintiff is that when the collision happened defendant's car was on the north side of the white line and therefore on Kennedy's side. The proof does not support this contention, as the preponderance of the evidence is that it occurred on the white line or rather on the south side thereof. He contends that, as defendant was on the wrong side at that time, the presumption is that he was negligent, unless "there were justifiable circumstances which excused his conduct," citing Schick vs. Jenevein, 145 La. 334, 82 So. 360, in support of that doctrine. The facts here show conclusively that, if the collision occurred on Kennedy's side of the road, defendant was forced there to avoid a head-on collision by the gross negligence of Kennedy, and that the conduct of defendant was entirely justifiable and excusable under the circumstances.

In Williams vs. Garcia, 2 La. App. 56, where it appeared if both parties had continued on their course a head-on collision would have inevitably resulted, Garcia swerved his car to his left towards the center of the street, and, as he did that, plaintiff for the same reason swerved to his right; plaintiff's car struck defendant's car on the right side near the door, and both cars were driven near the sidewalk. This conclusion, said the court, is supported by the relative position of the cars after the collision.

Here, this conclusion is supported not only by the relative position of the cars after the accident, but by the evidence of Mr. and Mrs. Opdenweyer and by the markings of the tires across the roadway.

The court in the case cited above, said, "It is true that if defendant had not swerved to the left that the collision would not have occurred," but, says the court in conclusion, "the swerving was brought about by the fault of the plaintiff."

Likewise it can be said here that the swerving by defendant was brought about by Kennedy, plaintiff's deceased husband. The defendant here was confronted with an emergency, was suddenly placed in a perilous situation, and, to avoid the impending danger, with little time to think or reflect, dashed across the road, and in which it must be held that he pursued the proper course and exercised ordinary care under the circumstances. See, also, Smith vs. Interurban Transp. Co., 5 La. App. 704.

Plaintiff invokes also the rule of the last clear chance, which it is contended defendant failed to observe. This rule has no application in this case, but, if it can possibly be applied, it can be said that, when defendant veered to his left, he offered Kennedy the opportunity to pass him on the south side of the road, and thus take advantage of the last clear chance to escape the impact. Kennedy, instead of doing this, veered simultaneously to his right and ran into defendant's car.

Even if it be conceded that defendant was at fault in darting across the road, Kennedy was also unquestionably primarily at fault in coming towards defendant on the wrong side of the road and thus compelling him to swerve to his left,

which brought about the collision in the middle or near the center of the highway. Taking that view of the case, which is not supported by the record, as defendant was at no time at fault, still, plaintiff *could not recover, nor could defendant,* if he had demanded damages, as both parties would in such a case be held at fault, where, under the well-settled rule in such cases, neither party can recover.

We have given the consideration due to the unanimous verdict of the jury and the judgment affirming it, but, after a careful, patient analysis of the facts and testimony, and looking at the case from every angle, we find it impossible to affirm the judgment. We find that the verdict and judgment are manifestly erroneous, and that defendant is entitled to a reversal.

It is therefore ordered, adjudged and decreed that the verdict and judgment appealed from be annulled, avoided and reversed, and that the demand of the plaintiff be, and is hereby, rejected at her cost in both courts.

---

## ON APPLICATION FOR REHEARING

MOUTON, J. Counsel for plaintiff again refers to the case of *Goldsby vs. Lowry,* 6 La. App. 450, but now states that the case was not decided on the point urged by him originally.

We have, in our original opinion, referred to that case and held that we could not accept the doctrine therein announced if the Judges of the Second Circuit intended it as a rule of law. We adhere to our conclusions on this question, as originally expressed.

Counsel again insists that the amended answer filed by defendant militates against his veracity. We have gone fully over this contention in our first opinion and held that the change he had made was to correct an original mistake, and that it had not in any way affected his credibility. It is needless to repeat here what we have heretofore said on this subject, wherein we find no error. Further in his brief filed in support of his application, counsel proceeds to attack the credibility of defendant and his wife. There are no facts or circumstances in the record to sustain that attack, and which is fully discussed in our original opinion. Counsel again advances the reasons originally assigned by him in support of his contention that the judgment below should be affirmed. Our original opinion will show that we have carefully, patiently and diligently gone, almost minutely, over all the material facts and corroborating circumstances of this case in which we were urged by the desire of not reversing the verdict and judgment appealed from unless assured that the jury had fallen into a manifest error in bringing a verdict against defendant and that the judge had likewise erred in approving it. If we were to indulge in another discussion of this case, we would only repeat what we have heretofore said, as it has been considered in all of its angles and phases in an opinion, much too long, its length being excusable only because we were impelled by the desire to satisfactorily meet all the contentions of learned counsel for plaintiff.

Counsel for plaintiff says that this court has held in a case to which he does not specifically refer, that judgments appealed from come up to the appellate courts with a presumption of correctness, or else there would be no value in the findings of the trial courts. We have invariably so held which is in conformity with the jurisprudence of this State. We have likewise never failed to recognize this rule in appeals from the verdict of juries approved by judgment of trial courts, and have always given great weight to such findings below. This rule recognizes the presumption of correctness of judgments appealed from, and the weight which should be given to the verdict of juries, but which in no wise antagonizes the well-established doctrine that when there is manifest error, a reversal is proper and must be granted.

In this very case, we have, in our original opinion, applied the principle of law above referred to in the following language:

"We have given the consideration due to the unanimous verdict of the jury and the judgment affirming it, but, after a careful, patient analysis of the facts and testimony, and looking at the case from every angle, we find it impossible to affirm the judgment. We find that the verdict and judgment are manifestly erroneous, and that defendant is entitled to a reversal."

We find no reason to change our former opinion or decree.