99 So.2d 161 (1957)
John Herbert PEEPLES, Plaintiff-Appellant,
v.
E. P. DOBSON et al., Defendants-Appellants,
Maryland Casualty Company, Intervenor-Appellee.
No. 8741.
Court of Appeal of Louisiana, Second Circuit.
November 26, 1957.
Rehearing Denied December 19, 1957.
Writ of Certiorari Denied February 10, 1958.
*163 Meadors, Shaw & Meadors, Homer, for plaintiff-appellant.
A. K. Goff, Ruston, for defendants-appellants.
Frank M. Dougherty, Homer, for intervenor.
GLADNEY, Judge.
John Herbert Peeples, an employee of the Department of Highways of the State of Louisiana, while driving one of its trucks, sustained personal injuries, and for the recovery of damages occasioned by the accident he has instituted this suit. Made defendants *164 were E. P. Dobson, the owner of a gasoline transport truck, his insurer, Manufacturers Casualty Insurance Company, and Velma H. Dobson, the driver of the Dobson truck. Maryland Casualty Company, the workmen's compensation insurer for the Department of Highways, intervened in the proceedings, claiming reimbursement for compensation and medical expenses paid to plaintiff. Following trial before a jury, a verdict was returned in favor of Peeples, holding Velma H. Dobson and Manufacturers Casualty Insurance Company liable in solido for $20,000. The verdict awarded the sum of $2,414.75 and attorney's fees of $500 in favor of the intervenor to be paid out of plaintiff's award. The verdict denied plaintiff's demands against E. P. Dobson. Judgment in accordance with the verdict of the jury was rendered. Velma H. Dobson and Manufacturers Casualty Insurance Company, being aggrieved by the judgment, have appealed. Likewise, the plaintiff has appealed from the decree insofar as it rejected his demands against E. P. Dobson. After the transcript of the proceedings had in the trial court was filed in response to the appeal in this court, plaintiff has answered the appeal praying for an increase in the amount of the award to the sum of $80,000.
The petitioner alleged that on April 4, 1956, Velma H. Dobson, an employee of E. P. Dobson acting within the scope of his employment, was driving a 1952 model Ford gasoline truck in a northerly direction on Louisiana Highway No. 4 between Ringgold and Castor, proceeding in the direction of the Town of Ringgold; that the gasoline truck was heavily loaded and equipped with tires so worn that they constituted a grave and serious traffic hazard; that about 2:30 o'clock P.M. on the date mentioned, Velma H. Dobson approached the crest of a hill approximately five miles from the Town of Ringgold on the aforesaid highway; that at the same time John Herbert Peeples was driving a 1954 International dump truck, the property of the Department of Highways, in a southerly direction and meeting the truck driven by Dobson; that as Peeples drove his dump truck up the hill on a gradual incline, he saw the truck being driven by Dobson swerve from its proper traffic lane into the lane occupied by Peeples' truck; that the gasoline truck continued to come down the road toward the dump truck in the wrong lane of traffic, apparently out of control; that when it became apparent that the Dobson vehicle was not going to get back into its own traffic lane and would collide with the dump truck, plaintiff swerved his dump truck to the left hand side of the road and entered the ditch on that side, in an effort to avoid a headon collision, and that plaintiff sustained serious injuries to himself as a result of the dump truck running into the ditch.
In response to plaintiff's petition it is alleged by the defendants that just prior to the accident Velma H. Dobson was driving the truck above described northerly along the hard surfaced blacktopped highway between Castor and Ringgold, Louisiana, about four or five miles south of Ringgold, at a speed not greater than 30 miles per hour, and had just traversed the crest of a hill when the left front tire of the vehicle blew out, thereby causing the truck to leave its right traffic lane and proceed into the left traffic lane, despite all efforts of the driver of said vehicle; that at the time of the blowout, the truck being operated by Peeples and traveling south on the highway, was more than 500 feet from the Dobson truck; and that Velma H. Dobson was able to bring his vehicle to a virtual standstill at a point more than 171 feet from the point where Peeples' truck was driven across the highway into a ditch on the east side thereof. Further allegations are to the effect that the tire which blew out had recently been inspected and there were no indications or evidence whatsoever that said tire would blow out suddenly and without warning. Further answering, and in the alternative, defendants charge Peeples was contributorily negligent, specifying that plaintiff did not have his *165 vehicle under proper control; that the brakes of the dump truck were defective; that plaintiff was not keeping a proper lookout; that prior to the time plaintiff drove his car into the ditch there was ample space on the highway upon which the dump truck could have been brought to a stop before reaching the point where the gasoline truck was practically at a standstill; and that plaintiff did nothing until he suddenly drove the truck off the highway, having driven it 300 feet after having seen the sudden emergency into which the driver of the gasoline truck had been placed by the sudden blowout.
Upon the trial the testimony of three eyewitnesses was taken. These included the driver of each truck and Ruben Blackwell, the driver of a third truck, and an employee of the Department of Highways. At the time the dump truck of Peeples crashed into the ditch, Blackwell was following Peeples in a similar truck with a distance of approximately 70 yards being maintained between the two vehicles. Testimony was given by A. E. Whitman, Tom Martin, Jr. and Herman Culpepper as to tire marks upon the surface of the highway and other evidence of a physical nature found upon their arrival at the scene of the accident shortly after it had occurred.
Testimony disclosed that weather conditions were good, the surface of the highway was dry and visibility was excellent. From the crest of the hill near the top of which the tire blowout occurred, and proceeding northerly toward Ringgold, the highway is comparatively straight for several thousand feet. The hill gradually slopes downgrade toward the north for a distance of from 750 to 900 feet from its crest. At the foot of the slope, the highway to the north is level and straight for a considerable distance to the north. Photographs placed in the record indicate the presence of ditches on either side of the highway near the locus of the accident approximately five or six feet deep. The paved portion of the highway is 18 feet in width and the road has shoulders, each of which is three feet in width. Pine trees of substantial size grow along the side of the ditch west of the highway for some distance north of the point of the accident.
An examination of the testimony discloses sharp differences only with respect to the condition of the tire prior to its blowout; the distance separating the two trucks driven by Robson and Peoples at the time when Peeples turned his truck to the left side of the highway and ran it into a ditch; and finally, there is some marked difference in the testimony between Dobson and Peeples as to the speed of the Dobson truck at the time of the blowout and its velocity as it continued to a point of rest north of the locus of the accident. In attempting to resolve the conflicts in the testimony of the three eye witnesses, we pretermit for the present a discussion of the condition of the tire.
A written statement signed by Peeples on April 18, 1956, shortly after the accident occurred, and submitted in evidence, contains his version of what occurred:
"I was driving at a speed of about 30 MPH, and was in a flat approaching a hill about 200 yards long. I had just passed another State Truck, which was driven by Ruby Blackwell of Athens, La. and had gotten back over into my lane. I was about 300 yards from the top of this hill when I saw a 1951 Ford Bob truck with a tank on it top the crest of the hill coming in my direction. It appeared that the truck was pulling over into my lane at this time. I thought that he might be lighting a cigarette and had his hand off the wheel, and that he would get back on his side of the road. I kept on going, thinking that he would get back over on his side, but when I got about 20 feet from him, I realized that he was evidently not going to pull back on his side of the road. I immediately took my foot off of the gas pedal and swung my wheel to the left and got over in his lane. The *166 fronts of the trucks were just coming abreast of each other when it seemed that this truck seemed to swerve back towards me. I gave the wheel a short jerk to the left to keep him from hitting me, and my two left wheels went off the blacktop. I then hit my brakes, not too hard, but the shoulder of the road was very narrow and was washed out in places, and my truck went on off the shoulder and into a deep ditch and hit the far bank of this ditch and turned over. The brakes on my truck were good, and they didn't lock. The first time I applied my brakes was when the left wheels of my truck went off the blacktop. I never heard any noise like a blowout, but the closer we got, I could see something `flopping' on his left front wheel, like a flat. This truck was driven by a white fellow whose name I don't know. This fellow was driving at around 45 MPH to the best of my estimation. He and Blackwell got me out of the truck and Blackwell took me to Ringgold where I was given two shots and some X-rays, but I was driven back to Homer and I came into the Homer Hospital the same day * * *."
Dobson testified that he was driving about 75 feet north of the crest of the hill when his left front tire blew out, thereby causing his vehicle to swerve into the left or west lane of the highway. He estimated the position of Mr. Peeples at that time to be close to the foot of the hill, some 800 or 900 feet north of the crest of the hill which Dobson had just passed. He described his movements from that point as follows:
"A. And I drove approximately two hundred (200) feet before I got my truck, you know, straightened up in the road and in line between the white lines and the shoulder of the road and everything. And I reckon I musta drove something like a hundred and fifty (150) feet further and by that time Mr. Peeples had turned over; and when Mr. Peeples turned over there, I released my brakes and just let my truck drift on down, you know, practically as fast as it would, to get down there to help give assistance in getting him out. In other words, I reckon I drove right in behind where the truck was turned over and stopped, you know, as quick as I possibly could, and got back up there, you know, to help give assistance to get Mr. Peeples out.
"Q. How fast was your truck going at the time that Mr. Peeples drove his truck into the ditch and turned it over? A. Well, I was practically stopped, you might as well say, when Mr. Peeples went in the ditch.
"Q. Yes, sir. And how far was it between the two vehicles at the time that Mr. Peeples drove his truck into the ditch? A. Well, it was about a hundred and seventy-one (171) feet.
"Q. Yes, sir. In other words, you had not gotten closer to Mr. Peeples' truck, when Mr. Peeples ran it in the ditch, by about a hundred and seventy (170) feet? A. That's right.
"Q. Yes, sir. Now, at that time, in what were you in the process of doing? A. Well, I stopped my truckYou mean, at the time that I stopped my truck?
"Q. No, sir. At the time that Mr. Peeples ran his truck into the ditch. A. Well, at the time Mr. Peeples ran his truck, you knowin other words, I was fixing to try to pull back over in my lane, you know, to get back on that side; but when he did turn over, instead of doing that I just went straight, right straight on down, just straight as I could, `til I passed the truck there and pulled back over on the right-hand side, back of the truck.
"Q. Did I understand you to say that you had your truck practically stopped, back up the hill farther? *167 A. I did; practically stopped, something like a hundred and seventy-one (171) feet from where Mr. Peeples turned over.
"Q. Yes, sir. Why didn't you cut back on your right side of the road, then? A. Well, I was so close under the hill there `til I knew that probably if I might have started crossingcross that road, cutting back over there, someone top that hill running pretty fast could, you know, might run into me and probably cause more trouble by me, you know, getting across the road, going straight across the road. The truck is pretty long and, of course, if someone had been behind me, why
"Q. Is this a trailer truck, or is it what we call bobtail truck? A. It is a bobtail truck.
"Q. In other words, it's all one vehicle, without any coupling between the truck part and the trailer part? A. Yes, sir."
Ruben Blackwell testified he was trailing Peeples at a distance of about 70 yards when the latter swerved his truck and went into the ditch, and Blackwell immediately stopped his truck about 200 feet north of Peeples' wrecked truck. He testified the distance between the two trucks at the time Peeples made his left turn was about 40 feet and that when Dobson brought his truck to a stop after the accident it was 200 feet north of Peeples' truck. Blackwell said just prior to encountering the Dobson truck, Peeples had passed him at a speed of about 40 miles per hour and a speed of 35 to 40 miles per hour was being maintained by both highway trucks when Peeples started up the hill.
State highway patrolman A. E. Whitman arrived at the scene of the accident a short time after it happened, and while there, together with Tom Martin, Jr., the town marshal of the Town of Ringgold, and Herman Culpepper, Deputy Sheriff of Bienville Parish, regulated traffic and made an investigation. He testified he observed tire marks near the point where Peeples' truck entered the ditch in the west lane of the highway. He said tire marks apparently made by the Peeples truck extended a distance of 75 feet and then for a further distance of 50 feet toward the south there were no tire prints on the surface of the highway, and then again there were tire marks as if caused from a sudden turn of the wheels. Whitman said the marks were found on the highway nearly opposite from the wrecked vehicle. The suggestion here is that Peeples before leaving the west side of the highway applied his brakes which caused the tires to leave prints upon the surface of the highway for a distance of 75 feet and then during the next 50 feet the brakes were released with the result that no further tire prints were registered until the front wheels were apparently quickly turned toward the left.
We think the foregoing testimony points to the following conclusions: Dobson was traveling at a speed of 30 to 40 miles per hour at the time of the blowout. His vehicle traveled some distance before he could bring it under control, which distance he testified was 200 feet. He then traveled an additional 150 feet with his truck under control and thereafter continued to drive the truck on the west side of the highway until he finally turned it to the east side and brought it to a position of rest that Blackwell testified was 200 feet north of the point where Peeples entered the ditch. The record indicates that before anticipating any danger which might arise from the Dobson truck being in his lane of traffic, Peeples was traveling 30 to 40 miles per hour. The truck driven by Peeples entered the ditch at a point approximately 350 feet from the bottom of the hill and approximately 400 feet from the point where Dobson's tire blew out. It is shown that the total distance between the crest of the hill and the bottom of the hill is from 750 to 900 feet.
The testimony of Trooper Whitman must be considered as true and discloses Peeples *168 drove his truck with tire prints measuring a distance of 75 feet and then the truck traveled an additional 50 feet farther before it was turned to the left. This represents a movement of the truck of 125 feet and reaction time adds an additional 40 to 50 feet, all of which indicates Peeples was exercising control for some purpose over a distance of 160 feet before he turned to the left.
With these facts before us shall we find that Peeples prematurely and negligently maneuvered his car out of the path of the gasoline truck? To affirmatively answer the question we must carefully examine the testimony of Dobson, having in mind that Peeples and Blackwell testified that at the moment the highway truck was turned to the left, there was only a short intervening space, from 20 to 40 feet, between it and the gasoline truck. Although we find nothing in the record to cause us to question the verity of the testimony of any of these witnesses the verdict reflects the decision by the jury that the space between the two vehicles at the time Peeples drove his truck to the left was so narrow that he was faced with a sudden emergency which he attempted to solve by turning to his left.
Another important question is the velocity of the gasoline truck after the tire blew out, a distance in excess of 500 feet, tified his vehicle moved 200 feet before he could control it and then he proceeded with the truck under control for a further distance of 150 feet. He also testified that by this time Peeples' truck had entered the ditch and he was nearly at a standstill 171 feet uphill from that point. He then testified he continued driving his truck on the west side of the road and finally brought it to a stop on the east side of the road. Blackwell fixes this point as being 200 feet north of the scene of the accident. The truck was loaded with 1,140 gallons of gasoline, an undisputed fact. Surely this heavy load would tend to accelerate the momentum of the truck as it proceeded down hill. Dobson testified at no time did he apply his brakes during his movement after the tire blew out, a distance in excess of 500 feet. If Dobson's testimony is true it is difficult to understand why Peeples did not realize the gasoline truck was virtually at a stand still while the two vehicles were 170 feet apart; and, we wonder, if he did so recognize this fact, why he should have been concerned as to whether to stop his truck, turn to the left, or why he did not continue normally as if the Dobson truck was stopped. Again we must point out that the jury obviously reasoned as reflected in their verdict, that the gasoline truck was traveling at a speed sufficient to alarm Peeples when he turned to the left. Had the jury believed Peeples was confronted with a situation of a truck on the highway somewhat more than a distance of 300 feet away, virtually standing still, there could have been no reasonable foundation for the jury's verdict. We think it apparent the decision of the jury did not approve of the testimony on this point.
After our examination of the testimony relating to the issues of fact hereinabove discussed, we find ourselves not in disagreement with the conclusions reached by the jury as to the negligence of Velma H. Dobson and that such negligence was the sole proximate cause of the accident.
Counsel for appellants invite our attention to the following authorities as indicative of the contributory negligence of Peeples: Manuel v. Vidrine, 1929, 9 La.App. 446, 119 So. 542; Williams v. Brown, 1937, La.App., 181 So. 679; Davis v. Lewis & Lewis, 1954, La.App., 72 So.2d 612, reversed 1955, 226 La. 1064, 78 So.2d 174; Ramsey v. McDaniel, 1955, La.App., 84 So.2d 276.
In Manuel v. Vidrine and Ramsey v. McDaniel driving conditions were pertinent in resolving the issue of the negligence of the party driving on the right side of the highway. In each case the driver in his proper lane of travel was held negligent because under the existing circumstances he was driving at an excessive rate of speed. The court held in Williams v. Brown the *169 defendant had the last clear chance to avoid the accident and based this finding on testimony of Brown that he admonished his driver 100 yards or more distant from the truck in which the plaintiff was driving, that "Negroes always take the road." [181 So. 682.] Notwithstanding his employer's instructions, Lovett, the driver of defendant's car, failed to heed the admonition to be careful and watch the other vehicle.
In Davis v. Lewis & Lewis, a judgment of the court of appeal, holding plaintiff guilty of contributory negligence when he did not stop when it became apparent to him the truck of the defendants would or could not regain its proper lane was reversed by the Supreme Court and judgment rendered in favor of Davis. Where an accident results from a condition of danger arising from the fact two cars are meeting each other in the same traffic lane, it is necessary for the court to examine most carefully all the circumstances that would influence a reasonably prudent motorist acting in a similar situation. Ramsey v. McDaniel is a case in which the trial court had cast the defendant, holding that he had the last clear chance to avoid the collision. On appeal, this court held McDaniel was negligent in driving his car at an excessive rate of speed with road conditions what they were. In support of our views in that decision, the reasoning of the Supreme Court in Davis v. Lewis & Lewis, and a pertinent statement from Blashfield's Cyclopedia of Automobile Law & Practice, Volume 2, Section 919, were relied upon. The principle found in Blashfield declares:
"A motorist has a right to assume that the driver of a vehicle coming from the opposite direction will obey the law, and to act upon such assumption in determining his own manner of using the road. A driver, therefore, proceeding on the right side of the traveled way, may assume that the driver of a vehicle approaching on the same side, or on his left-hand side, will do all that a reasonably prudent person, under all the circumstances, would do to avoid a collision, which ordinarily would be to yield half the way, or to turn out in time to avoid a collision, and that such driver will not force him, in violation of the statute or ordinance, or the law of the road, to turn from the part of the road on which he is lawfully driving.
"Likewise, a motorist on the right side of the road and traveling in a lawful manner can assume that one approaching in the opposite direction will control his car in obedience to the law of the road and will not suddenly turn across his path.
"These assumptions may not be indulged in, however, after he sees or ought to see, from the situation of the cars or highway or the conduct of the approaching driver, that they are unwarranted. In other words, the duty of an automobile driver, who is on the right side of the street, to stop or take other precautions to avoid a collision with an approaching vehicle, only arises when by due care he discovers that another on the wrong side of the street cannot or will not himself turn to the right to clear his way. It follows that his right to assume that the other driver will comply with the laws of the road is not absolute, but may be qualified by the particular circumstances such as the other vehicle's proximity, position and movement and the condition of the road, including the usable width."
In the cited case the Supreme Court affirmed the decision of the trial judge. The dissenting opinion in the Court of Appeal quoted from the written opinion of the district judge, as follows [226 La. 1064, 72 So.2d 618]:
"The defendant alternatively pleads contributory negligence on the part of plaintiff, averring when he perceived his peril he should have come to a stop. Had he done so, this might or *170 might not have avoided the collision. It might possibly have made matters worse. In any event he was confronted with an emergency not of his own making and with little time to weigh the probabilities. He was warranted in believing that the truck driver would do what he should have done and it does not appear that he had the last clear chance of avoiding the accident by any action he might have taken.

* * * * * *
"`The difficulty with this rule is that, although a traveler on the right may know that, if the on-coming vehicle maintains its course, there will inevitably be a collision, he can not know that the driver of such a car will not turn in time to avoid a collision, in which event if he himself should turn to the left in violation of the rules of the road he would probably precipitate the catastrophe which he is seeking to avoid, and liability for which it would be hard for him to escape. It might seem better for him either to hold his course if a further turn to his right is impracticable or to stop and rely on the other driver changing his course in time, and so it is held in some jurisdictions.' Blashfield, Vol. 2, Secs. 919, 920 and 921, pages 92-105; Manuel v. Vidrine, 9 La.App. 446, 119 So. 542; Cutrer v. Jones, La.App., 9 So.2d 859; Kennedy v. Opdenweyer, 11 La.App. 532, 121 So. 636; Ford, Bacon & Davis, Inc., v. Shaw, 8 La.App. 751; Smith v. Baker, La.App., 59 So.2d 714."
In the instant case Peeples was proceeding in a lawful and prudent manner on his side of the road when he found he was meeting a truck several hundred feet away. The truck appeared to be under control as it was moving at a reasonable speed and continuing in a straight line, although in the wrong traffic lane. Peeples' first reaction was the driver of the gasoline truck was lighting a cigarette and had his hand off the wheel momentarily, but as the two vehicles came closer to each other with the intervening space being rapidly narrowed, the other driver did not return to his side of the highway. Peeples testified he did not discover that Dobson had a flat tire until the two vehicles were close together, or as he testified "just about the time I gave my truck a short turn to the left, but I hadn't noticed anything up until that time." This was when he observed the tire "flopping". If we accept the verity of the above testimony, the conclusion is inescapable that Peeples had a right to expect the gasoline truck to return to its side of the road or come to a stop. However, Dobson did neither. He removed his foot from the brake pedal and let it roll without decreased speed until he brought his vehicle to a stop below the locus of the accident. Dobson, himself, testified that after his truck was brought under control he traveled about 150 feet, during which distance he could have returned to his right side of the road. He further stated he had intended to make such a maneuver but when he was about to do so Peeples turned left and went into the ditch. In continuing to remain on the wrong side of the road when he could have returned to his right side of the highway while the two vehicles were still a considerable distance apart, Dobson was directly responsible for creating an emergency, the dire consequences of which Peeples sought to avoid by trying to pass to the left of Dobson.
Was Peeples guilty of contributory negligence in failing to timely realize he must either stop or take the open lane on the left side of the highway? His problem was not complicated by other motorists. Excepting Dobson, there was none other than Blackwell, who was 70 yards distant to his rear. Peeples' problem would have been simple of solution, of course, if he could have been sure Dobson would remain in the same lane of travel.
The effect of defendants' plea of contributory negligence is to say that Peeples was likewise at fault by exercising poor judgment in not sooner attempting to pass to the left or in not sooner bringing his *171 vehicle to a stop. This argument, we think, is untenable under the facts presented. Peeples, of course, did try to pass to the left as soon as he realized it was unsafe to remain on his proper side of the highway. Had he pulled to the right and stopped, because of the narrow shoulders, he still was in danger. No specific act of negligence on the part of Peeples is indicated. He was prudently driving his truck in the proper lane of travel when Dobson continued to come forward on the wrong side of the highway.
The position of imminent peril in which the plaintiff found himself was one to which he had not contributed by negligence on his part. In Hudson v. Louisiana Electric Company, 7 La.App. 78, 84, it was said:
"A danger is not obvious until it is seen and understood. A risk is not assumed until it is known and realized."
The Supreme Court of this state in Snodgrass v. Centanni, 1956, 229 La. 915, 87 So.2d 127, 131, 132, after noting that the law does not require unerring choice of methods of escape where a motorist suddenly finds himself in a position of imminent peril, went on to comment:
"The circumstances under which a person is required to choose between methods are material in determining whether he was negligent in his choice. Usually the safest course to take when one is handling a vehicle in traffic is to stop when danger presents itself, but there is no requirement of law which will render one negligent if he fails to stop, where, in a sudden emergency, another course of conduct is consistent with ordinary prudence. The law does not expect one to exercise the same degree of judgment in an emergency wherein his personal safety is threatened, as in a situation where he is not subject to the fear of sudden disaster. The law recognizes the fact that a prudent man, when brought face to face with an unexpected danger, may fail to use the best judgment, may omit some precaution he might have taken, and may not choose the best available method of meeting the dangers of the situation. It does not charge him with contributory negligence for the fact alone that he makes a mistake in the method adopted to escape a peril which exists not through his fault, but through the negligence of another. 38 Am.Juris., sec. 194, verbo `Negligence'."
We are of the opinion the evidence fully supports the verdict of the jury in finding Peoples was not contributorily negligent.
We find it proper to consider briefly two issues argued on the appeal by counsel for the appellants.
The first of these deals with three special charges which were duly objected to by appellants, but nonetheless given to the jury. We are of the opinion the charges were properly given. The contention does not present a question of reversible error in any event, however, as this court exercises the right to review and alter as to facts and law, the verdict of a jury or the findings of the trial judge. We have examined the record as to these issues and find the rulings complained of were not prejudicial. We think the judge a quo acted properly in giving the special charges.
Counsel for appellants further contend the trial court erred in overruling their exceptions of no cause or right of action. The exceptions were leveled at two points: One of these points relates to the allegations of paragraphs 13 and 14 of plaintiff's petition, in that the allegations admit plaintiff realized the gasoline truck was continuing to come down the road toward Peeples' truck in the wrong lane of traffic, apparently out of control; and the second point is directed at petitioner's allegations that when it became apparent *172 said truck would not get back into its own traffic lane, and would collide with the dump truck, plaintiff swerved his own truck to the left side of the road. This is not indicative of negligence per se and, therefore, we do not agree with counsel's argument, for the thought imparted by the petition is that plaintiff did attempt to act as soon as he realized he was presented with an emergency situation. The exceptions are technical and if sustained would require an uncommon interpretation of plaintiff's pleadings. This court has repeatedly refused to sustain technical objections, the effect of which would be to deny a plaintiff the right to litigate his cause. Especially should this ruling be applied where, as herein, the allegations of the petition indicate there may exist a legal right deserving of judicial consideration. We think the exceptions were properly overruled.
Plaintiff in charging that it was negligence for the owner and driver of the gasoline truck to drive it on the public highways with a worn or defective tire which could have been detected by proper inspection, draws our attention to LSA-R.S. 32:244, which contains special provisions for vehicles transporting explosives or inflammables on the public highways. Under this statute it is argued there was a special duty to inspect all equipment on the truck. The evidence fails to prove the defective quality of the tire which blew out should have been discovered before Dobson set out on the subject trip. The preponderance of the testimony showed the tire was timely and properly inspected. But, notwithstanding our views upon the tire issue, the point raised does not appear to be material. This is so because Velma H. Dobson, the driver of the truck, after the blowout of the tire, admitted that he had ample time and opportunity to return to his right side of the highway, and his omission to do so was, in our opinion, an independent and intervening efficient cause of the accident. The condition of the tire, whether it resulted in an act of negligence, or not, was therefore a remote and not a proximate causal factor.
Peeples has appealed from the verdict and judgment which denied his right of recovery against E. P. Dobson, the owner of the gasoline truck. The pleadings and testimony admit of the fact that Velma H. Dobson, the driver of the truck, was an employee of E. P. Dobson. Consequently, under LSA-Civil Code article 2317 the doctrine of respondeat superior applies, and E. P. Dobson should have been cast in judgment together with Velma H. Dobson and the insurer of the Dobson truck. The verdict and judgment in this respect must be reversed.
The extent and nature of the injuries sustained by plaintiff are not seriously disputed but the amount of the jury award is questioned by appellants and appellees. The medical testimony of Dr. W. P. Gladney of Homer was relied upon by all parties.
Plaintiff at the time of the accident was 59 years of age with a life expectancy of 14.7 years. He was a regular employee of the Department of Highways and earning a salary of $250 per month. He was in apparent good health before he suffered the injuries complained of in this suit. Briefly we list the medical findings of Dr. Gladney: multiple bruises and contusions, a puncture wound in the head, a whiplash injury and the fracture of the sixth, seventh and eighth ribs on the left side, and in addition to these the ninth rib torn from its cartilage. The whiplash injury caused occipital neuralgia and the fractured ribs produced pneumonia and pleural effusion, the end result of which was to bring about a condition known as pulmonary emphysema. Peeples remained in a hospital from April 4th to April 20, 1956, during which time the neuralgia caused him extreme pain, necessitating the frequent use of sedatives.
Plaintiff has complained he suffers from a severe rash which was aggravated by the accident but this was not made out or established by the medical testimony and *173 cannot be considered in arriving at a proper award.
The effect of the pulmonary emphysema was not fully recognized until about two months after the accident. The condition prevents Peeples from exhaling the full amount of air inhaled. The doctor said there was no known specific by which the emphysema may be combatted and that the condition might become progressively worsened or it could become arrested. It was Dr. Gladney's opinion that due to this condition plaintiff was totally and permanently disabled. The effect on plaintiff's physical condition is to prevent him from taking any appreciable amount of exercise as he is constantly short of breath. The evidence makes it clear plaintiff cannot be expected to resume his occupation as a truck driver or any other employment requiring some bodily exercise. The doctor also testified the emphysema would prove a dangerous complication should Peeples contract pneumonia or other respiratory troubles.
The record indicates plaintiff has had some prior experience as a merchant and clerk. We are doubtful these talents will prove helpful to plaintiff's future earning capacity. Using the foregoing as criteria, we are of the opinion the verdict of the jury is inadequate and it should be increased to $25,000. The verdict in favor of intervenor does not present an issue on the appeal.
Accordingly, and for the reasons hereinabove set forth, the judgment from which appealed is hereby reversed insofar as it rejects plaintiff's demands against E. P. Dobson, and further we hold the judgment against the defendants, including E. P. Dobson, should be increased to $25,000 and will be amended accordingly. As so reversed in part and amended in part, the judgment is affirmed in all other respects. The judgment will in part only be recast to read as follows:
It is ordered, adjudged and decreed that defendants, E. P. Dobson, Velma H. Dobson and Manufacturers Casualty Insurance Company, in solido, pay to the plaintiff, John Herbert Peeples, the sum of $25,000 with legal interest thereon from date of judicial demand until paid.
It is further ordered that E. P. Dobson, Velma H. Dobson and Manufacturers Casualty Insurance Company pay all costs of this suit, including costs of the appeal.